[Cite as *State v. Henry*, 2016-Ohio-692.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 102634**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## STEVE D. HENRY

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-582467-A

**BEFORE:** E.A. Gallagher, J., Celebrezze, P.J. and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** February 25, 2016

**ATTORNEYS FOR APPELLANT**

Michael J. Connick
Gary A. Vick, Jr.
Connick & Associates, Co., L.P.A.
25550 Chagrin Blvd. Suite 101
Beachwood, Ohio 44122


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY: Fallon Radigan
        Daniel T. Van
Assistant Prosecuting Attorneys
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN A. GALLAGHER, J.:

**{¶1}** Defendant-appellant Steve Henry, who was indicted for felonious assault in violation of R.C. 2903.11(A)(1), appeals his conviction for the inferior offense of aggravated assault in violation of R.C. 2903.12(A)(1). Henry's conviction was based on an altercation in which he punched the alleged victim once. Henry asserts that a single punch cannot, as a matter of law, support a conviction for aggravated assault because it does not constitute "deadly force." He further contends that the trial court's findings that Henry acted with serious provocation and that the victim sustained serious physical harm were not supported by sufficient evidence and were against the manifest weight of the evidence. We do not find Henry's arguments persuasive. For the reasons that follow, we affirm Henry's conviction.

**Factual and Procedural Background**

**{¶2}** On February 6, 2014 at approximately 12:30 p.m., Vincent Gatto went to the Henry residence in Broadview Heights, Ohio to collect money he was allegedly owed by Henry's son, Bret Henry ("Bret"). An argument ensued and, as Gatto was leaving the home, Henry struck him in the face, allegedly injuring his upper lip and teeth. On February 24, 2014, a Cuyahoga County Grand Jury indicted Henry on one count of felonious assault in violation of R.C. 2903.11(A)(1). Henry pled not guilty, and the case proceeded to a bench trial. The state presented testimony from three witnesses: Gatto, Bret and Broadview Heights patrol officer, Troy Schonberger.

**{¶3}** Gatto testified that, on January 31, 2014, he had agreed to purchase a $50 gift card from Bret, one of his classmates at Broadview Heights/Brecksville High School, for

$35. At the time, Gatto was 18; Bret was 17. A paypal receipt allegedly evidencing the transaction was introduced into evidence.[1] According to Gatto, approximately one week later, after he attempted to use the gift card to purchase gasoline for his vehicle, he discovered that only $.84 was left on the $50 gift card. Gatto texted Bret regarding the issue. On February 6, 2014, Bret texted Gatto and invited him to come to his home to collect his money.[2] Gatto arrived at the Henry residence at approximately 12:25 p.m. He parked his car on the street in front of the house, left the engine running and walked to the front door. Gatto texted Bret that he had arrived and waited for him at the front door. Gatto denied ringing the door bell or knocking or pounding on the door. However, a minute later, Bret's father, Henry, came to the door. Gatto testified that Henry asked him why he was there and that he responded, "[Y]our son stole $50 from me. I'm here

---

[1] The paypal receipt reflects a payment of $36.32 to Bret on January 31, 2014 at 8:54 a.m. There was no testimony explaining why the payment was more than the $35 to which the parties allegedly agreed.

[2] A screen shot from Gatto's phone taken at 1:10 p.m. the day of the incident was admitted into evidence showing the following exchange of text messages beginning at 12:16 p.m.:

you comin or not
    Yes I am. Do you have my money
yea i got it.
    I'm here
come to the front
    Here
    Come to the door

Although Gatto claimed to have had other text message communications with Bret, he testified that these were the only text messages they exchanged that day and that he "deleted [Bret's] number and any text messages after or before this incident."

to receive it. He told me to come over here." Gatto said that Henry replied, "My son isn't giving you anything."

{¶4} After exchanging "a little more words," Gatto stated that he was "upset" and "mad" but that he decided to leave and walked down the driveway towards his vehicle. Henry followed him. The pair continued to "exchange angry words" as Henry followed Gatto down the driveway; however, there was no physical contact between them.

{¶5} According to Gatto, as he stood in the street about to get into his car, Henry said something to him and Gatto turned around. Gatto testified that Henry then asked him if he had any drugs on him. After Gatto replied that he had no drugs, Henry threatened to make a "citizen's arrest," and Gatto told Henry to "show me your badge." Henry then asked Gatto what he was going to do to Bret. Gatto said, "[N]othing. I don't want to see him" and "I'm done with him."

{¶6} Gatto testified that after the two men exchanged these "final words," Henry struck him in the mouth with his fist. Henry punched Gatto once, Gatto fell to the ground and Henry left and went back into the house. Gatto testified that, as a result of the punch, his upper lip was "split in two," his two front teeth were "bent in" and blood was dripping on his cell phone.

{¶7} After Henry went back into the house, Gatto stood up, got into his car and called his mother who told him to come home. Gatto drove home and his parents drove him to the emergency room at Marymount Hospital.

{¶8} At the hospital, Gatto was disruptive and yelled and cursed at the hospital staff. Although he testified on direct examination that when he arrived at the hospital, he was in "excruciating pain," he admitted on cross-examination that he had refused any pain medication. The medical records reflect that Gatto told the hospital staff shortly after his arrival that his pain level was six out of ten. With respect to the medical treatment he received for his injuries, Gatto testified that he was at the hospital for "around five and a half hours," that he received "[a]round 30 stitches in and outside [his] lip" and that he wore gauze on his mouth, protecting his lip, for about four hours. Once the gauze was removed, no other bandages were required.

{¶9} Gatto's medical records from Marymount Hospital were admitted into evidence. Although Gatto claimed to have received 30 stitches, the medical records do not confirm this. The medical records indicate only that a "Dr. Ulvi graciously came in and repaired the patient's laceration." There is no reference in the medical records to the number of stitches, if any, Gatto received.

{¶10} With respect to the follow-up care he received, Gatto testified that his injuries did not require surgery but that a plastic surgeon removed his stitches. According to Gatto, he saw the "medical surgeon" "about five times" and his family dentist twice for the injuries he sustained in the altercation with Henry. No medical records documenting any of this alleged follow-up treatment were introduced into evidence. Gatto was not hospitalized, never lost consciousness and did not claim to have any scars or disfigurement as a result of the altercation. There was no evidence

that Gatto suffered from any continuing pain, that he missed any school or work or that he was otherwise incapacitated as a result of the injury to his upper lip.

{¶11} Troy Schonberger, a Broadview Heights patrol officer, testified that he responded to a call at the Henry residence regarding "a male threatening the caller's son." When he arrived at the residence, he was met by Henry and Bret. Henry informed the officer that Gatto had come to the house and was "beating on the door trying to get a hold of his son Bret because of money that was owed." Henry told Officer Schonberger that he believed Bret may have owed Gatto money for drugs, that he wanted "no part of that" and that he escorted Gatto off his property. Officer Schonberger testified that, according to Henry, when he and Gatto reached the end of the driveway and were standing in the street near Gatto's car, Gatto punched him in the face and that he "returned the punch." Officer Schonberger took photographs of Henry, including one photo that showed a small spot of blood on the right side of his face below his lip, a photo of Henry's face showing "no visible injuries" and a photo of Henry's left hand showing a "small injury" to his knuckle "consistent * * * with a punch." These photographs were admitted into evidence.

{¶12} Officer Schonberger also spoke with Bret. Officer Schonberger testified that Bret told him that the incident was the result of "a drug deal gone bad," i.e., that Gatto had given Bret inferior marijuana so he decided not to pay for it. Officer Schonberger testified that he had no evidence that there had been a drug deal and that if there had been evidence of a drug deal, he "he would have made arrests."

{¶13} While Officer Schonberger was at Henry's residence, dispatch received a call from a staff member at Marymount Hospital indicating that Gatto was there. Within 45 minutes to an hour, Officer Schonberger went to the hospital to take a report. He told Henry he would return after he finished at the hospital. When he arrived at the hospital, Officer Schonberger spoke with Gatto. Officer Schonberger testified that Gatto informed him that he had gone over to Henry's residence to try and get money for a $50 gift card he had purchased from Bret. According to Gatto, Henry came to the door, and the pair exchanged "angry words." Gatto then began walking down the driveway toward his car intending to leave and Henry followed him. When the two men reached Gatto's car, Henry struck him.

{¶14} Officer Schonberger testified that Gatto had a large split in his upper lip "that was going to require a plastic surgeon" and that Gatto was "irate" and "very, very upset," "lashing out at everybody around him," "verbally abusive to the hospital staff" and "standoffish" to the officer, cursing at him several times. He took pictures of Gatto's injuries, which were admitted into evidence. Officer Schonberger stayed at the hospital with Gatto for an hour and a half, then, "because of the injuries Mr. Gatto had received," he returned to Henry's residence.

{¶15} When Officer Schonberger returned to the Henry residence, he looked in the area where the altercation occurred but did not see any blood, blood marks or blood splatter. He then spoke briefly with Henry a second time. Henry denied that he had been injured when Gatto punched him and refused to speak further with Officer

Schonberger. Officer Schonberger knocked on the doors of several neighbors to determine if anyone had witnessed the incident but no one was home.

{¶16} Bret also testified. He admitted that he had invited Gatto over to his house on February 6, 2014 because he "was going to give [Gatto] his money that he wanted." Bret testified that he had sold Gatto a gift card in exchange for marijuana. Bret stated that Gatto had come over on February 5, 2014, when just he and his mother were home and that Gatto had banged on the front door, rang the doorbell repeatedly and had been screaming, swearing and threatening Bret that he was going to "get him" at school. Bret testified that he did not answer the door that day because his mother was crying and he was afraid Gatto was going to cause him harm. He told his mother not to call the police because he "didn't want to get in trouble for the transaction and everything." Bret testified that he told Gatto to come over the following day to get his money because he wanted it "to be over with" and for Gatto to "leave [him] alone."

{¶17} When Gatto arrived at the Henry's residence on February 6, 2014, Bret was in his room. Gatto banged on the door and rang the doorbell, screaming for Bret to come outside. Bret testified that when he looked out the window, he saw his dad answer the door and that the two men were talking. He then saw Gatto walk down the driveway followed by Henry. He testified that his view of the driveway was "partially limited" by trees in the front yard but that two or three times he saw Gatto turn around and take steps back towards Henry as they walked down the driveway. After that, he "really didn't see anything" because Gatto and Henry "disappeared behind the trees."

{¶18} At the close of the state's case, Henry moved for acquittal pursuant to Crim.R. 29(A), arguing that there was no evidence that Henry had knowingly caused Gatto serious physical harm. The trial court denied the motion. Henry then testified.

{¶19} Henry, a pediatric home health care nurse, testified that he was in his garage after snow blowing the driveway when he heard the doorbell ringing and someone pounding on the front door. He stated that he heard someone yelling in an "erratic" and "threatening" manner, "Bret. Come out here. Bret. * * * I'm going to kick you're a**. Come out here. I want my money." Henry indicated that he was aware that Gatto had come to the house the day before and threatened his son but that he had done nothing about it.

{¶20} Henry stated that he answered the door and said, "Yes?" and that Gatto replied, "Where's Bret. I want my f****** money." He testified that he told Gatto to leave and that he was not giving him "any drug money" and stepped out onto the front porch. Gatto raised his voice, "very adamant about this $50." After Henry again directed Gatto to leave, he started walking away, and Henry told him, "I'm calling your mother, the school, and the police." According to Henry, Gatto's behavior changed "for the worst." Gatto turned around and was "erratic, scary looking [and] aggressive."

{¶21} Henry testified that he again told Gatto to leave and began to follow him down the driveway. As the two men walked down the driveway, Henry told Gatto repeatedly that he was not to come back. Gatto responded, "I want my money. I always get my money. I'm going [to] kick Bret's a** tomorrow." Henry stated that he

did not go back into the house because he was not "turning his back on Mr. Gatto." Henry testified that he was "fearful" of Gatto and that as they were walking down the driveway, Gatto turned around and faced him "multiple times." At some point, Gatto "postured," i.e., making himself look bigger than he is, which heightened Henry's concern given that Gatto was taller than Henry and weighed more than he did.

{¶22} Twenty feet before the end of the driveway, Gatto turned around again. According to Henry, Gatto was "being very aggressive, posturing, threatening" and "disrespectful" and was "out of control." Henry testified that when they reached the street, Gatto threw a right punch at Henry. The punch connected "[s]lightly" and Henry responded, punching Gatto once. Gatto fell down, then got up and started yelling and screaming. Henry walked away, went into the house and called the police. Henry testified that punching Gatto was simply "a reaction" and that he did not intend to cut Gatto's lip. He acknowledged, however, that he knew there was "a chance" Gatto could get hurt.

{¶23} Gatto denied that he had ever sold marijuana to Bret, that he had been at Henry's residence the day before or that he, "at any point in time," threw a punch at Henry "or anything like that."

{¶24} After Henry completed his testimony, the defense rested and Henry renewed his Crim.R. 29(A) motion. Once again, the trial court denied the motion.

{¶25} In his closing argument, defense counsel argued that the state had failed to prove mens rea or that Henry had caused Gatto serious physical harm, beyond a

reasonable doubt. Defense counsel also argued that Henry had acted in self-defense. The trial court rejected Henry's self-defense claim. The trial court found Henry not guilty of felonious assault but guilty of the inferior offense of aggravated assault under R.C. 2903.12(A)(1).

{¶26} On January 6, 2015, Henry filed a motion to vacate the finding of guilt arguing that a conviction for aggravated assault requires the use of deadly force and that a "one-punch situation cannot, as a matter of law, ever constitute deadly force." After hearing argument on the issue, the trial court denied the motion, sentenced Henry to one year of community control and ordered him to pay $75 in restitution.

{¶27} This appeal followed. Henry has raised the following three assignments of error for review:

> ASSIGNMENT OF ERROR NO. 1:
> The trial court erred in finding the defendant guilty of aggravated assault which requires the use of deadly force, when the law states that a one-punch felonious assault does not rise to the level of deadly force.
>
> ASSIGNMENT OF ERROR NO. 2:
> The trial court erred in finding serious provocation.
>
> ASSIGNMENT OF ERROR NO. 3:
> The trial court erred in finding that the victim suffered serious physical harm.

**Law and Analysis**

{¶28} Henry was convicted of aggravated assault in violation of R.C. 2903.12(A)(1). R.C. 2903.12(A)(1) provides, in relevant part:

No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly * * * [c]ause serious physical harm to another * * *.

{¶29} Aggravated assault is an inferior offense of felonious assault. Its elements are identical to felonious assault except its nature and penalty are mitigated by one or two mitigating circumstances, i.e., sudden passion and/or a sudden fit of rage brought on by serious provocation occasioned by the victim. *See, e.g., State v. Deem,* 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), paragraph four of the syllabus; *State v. Williams*, 8th Dist. Cuyahoga No. 98210, 2013-Ohio-573, ¶ 21; *State v. Searles,* 8th Dist. Cuyahoga No. 96549, 2011-Ohio-6275, ¶ 18; *see also* R.C. 2903.11(A)(1) (a person commits felonious assault where he or she "knowingly * * * [c]ause[s] serious physical harm to another * * *"). While the state must prove the elements of the offense beyond a reasonable doubt — i.e., that the defendant knowingly caused serious physical harm to the victim — in order to mitigate felonious assault to aggravated assault, the defendant bears the burden of proving the existence of one or both of the mitigating circumstances by a preponderance of the evidence, i.e., that he or she acted under the influence of a sudden passion and/or a fit of rage, which was the result of serious provocation by the victim. *State v. Rhodes*, 63 Ohio St.3d 613, 617, 590 N.E.2d 261 (1992), fn. 2; *Williams* at ¶ 21; *Searles* at ¶ 18.

**Use of "Deadly Force" and Serious Provocation**

**{¶30}** Henry's first two assignments of error are interrelated and will, therefore, be addressed together. In his first assignment of error, Henry argues that his conviction for aggravated assault should be overturned because no evidence was presented "as to the critical element of deadly force." Henry contends that it was undisputed that he punched Gatto only once and that one punch is insufficient as a matter of law to constitute "deadly force." In his second assignment of error, Henry argues that his conviction should be overturned because the trial court's finding of serious provocation was not based on sufficient evidence and was against the manifest weight of the evidence. Henry's arguments are meritless.

**{¶31}** A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state met its burden of production. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1977). When reviewing sufficiency of the evidence, an appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In a sufficiency inquiry, an appellate court does not assess whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v.*

*Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *Thompkins* at 387; *Jenks* at paragraph two of the syllabus.   In considering whether the evidence at trial was sufficient to support a conviction, "[a]n appellate court must review 'all of the evidence' admitted at trial," including the evidence offered by defense.   (Emphasis omitted.) *State v. Tate,* 140 Ohio St.3d 442, 2014-Ohio-3667, 19 N.E.3d 888, ¶ 18 (appellate court was required to consider the defendant's own testimony in evaluating sufficiency of evidence to support his convictions following bench trial)*,* quoting *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.E.2d 560 (1979).

{¶32} In contrast to a challenge based on sufficiency of the evidence, a manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion.   *State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26, citing *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541; *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13.   When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "thirteenth juror" and may disagree "with the factfinder's resolution of conflicting testimony."   *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).   Weight of the evidence involves "the evidence's effect of inducing belief."   *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing at *Thompkins* at 386-387.   "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?"   *Wilson* at ¶ 25.   The reviewing court must examine the entire record,

weigh the evidence and all reasonable inferences, consider the witnesses' credibility and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). In conducting such a review, this court remains mindful that the credibility of witnesses and the weight of the evidence are matters primarily for the trier of fact to assess. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

**{¶33}** Citing this court's decision in *State v. Triplett*, 192 Ohio App.3d 600, 2011-Ohio-816, 949 N.E.2d 1058 (8th Dist.), Henry argues that "deadly force" is an element of aggravated assault under R.C. 2903.12(A)(1) and that because there was no evidence Henry used "deadly force," his conviction for aggravated assault must be reversed.

**{¶34}** In *Triplett*, the defendant punched the victim once. *Id.* at ¶ 4. The victim suffered a head injury and died later that day. *Id.* The defendant claimed he was acting in defense of his sister. *Id.* A jury found him guilty of felonious assault. *Id.* at ¶ 3. The defendant asserted (among other alleged errors) that the trial court erred in failing to instruct the jury regarding the defense of another involving the use of non-deadly force. This court agreed, stating, "[w]e do not agree that one punch, even when a death occurs,

is comparable to deadly force" and that "when 'there is sufficient evidence of self-defense involving non-deadly force * * * the trial court must instruct the jury on that defense.'" *Id.* at ¶ 14, quoting *State v. Griffin*, 2d Dist. Montgomery No. 20681, 2005-Ohio-3698.

{¶35} *Triplett* addressed whether the trial court was required to give a self-defense jury instruction regarding the use of non-deadly force where the defendant threw a single punch. It does not stand for the proposition that deadly force is an element of the offense of aggravated assault. To the contrary, the court held that "the 'serious harm' required for felonious assault does not equal deadly force" and that "'knowingly' causing 'serious harm' does not automatically equate to 'deadly force.'" *Triplett* at ¶ 14, quoting *State v. Pannetti*, 8th Dist. Cuyahoga No. 73044, 1998 Ohio App. LEXIS 4123 (Sept. 3, 1998). Accordingly, *Triplett* does not support Henry's contention that proof of the use of "deadly force" was required to sustain his conviction for aggravated assault.

{¶36} As stated above, the elements of the offense of aggravated assault under R.C. 2903.12(A)(1) are that the defendant knowingly caused serious physical harm to another person. As used in R.C. 2903.12(A)(1), "deadly force" merely describes the "seriousness" of the provocation required for a defendant to qualify for mitigation, i.e., "serious provocation * * * that is reasonably sufficient to incite the person into using deadly force." In other words, it is part of the mitigating circumstances, which are not an element of the offense. *See, e.g., Rhodes*, 63 Ohio St.3d at 617, 590 N.E.2d 261, fn. 2; *Deem,* 40 Ohio St.3d at 210-211, 533 N.E.2d 294; *State v. Ramey,* 8th Dist. Cuyahoga No. 69080, 1996 Ohio App. LEXIS 956, *26 (Mar. 14, 1996); *see also State v. Kurincic*,

8th Dist. Cuyahoga No. 68246, 1995 Ohio App. LEXIS 5296, *13-14 (Nov. 30, 1995) (rejecting defendant's argument that he could not be convicted of aggravated assault "because under R.C. 2903.12(A), the provocation must be such as to bring on deadly force"), citing *State v. Newell*, 8th Dist. Cuyahoga No. 6472, 1993 Ohio App. LEXIS 2371, *12 (May 6, 1993).

{¶37} The deficiency about which Henry complains — both with respect to his "deadly force" argument and his broader claim that his conviction should be overturned because the trial court's finding of serious provocation was not based on sufficient evidence and was against the manifest weight of the evidence — is not the absence of evidence (or the absence of credible evidence) of a necessary *element* of the offense of aggravated assault upon which *the state* has the burden of proof, but rather, the absence of evidence of a *mitigating circumstance* upon which *he* has the burden of proof. Because serious provocation is a component of the mitigating circumstances rather than an element of the offense, there was no obligation on the part of the state to prove serious provocation in order to obtain a conviction for aggravated assault. *See State v. Hayes,* 11th Dist. Ashtabula No. 97-A-0667, 1999 Ohio App. LEXIS 4645, *12 (Sept. 30, 1999) ("[T]he mitigating language contained in the aggravated assault statute does not constitute an element of the crime for which the burden of proof is ever placed upon the prosecution * * * ."); *Rhodes* at 617, 620, fn. 2.

{¶38} Even if, as Henry has argued, there was insufficient evidence (or insufficient credible evidence) to support a finding that Henry acted under the influence of a sudden

passion and/or a fit of rage occasioned by serious provocation by Gatto, the trial court's error was to Henry's benefit not to his prejudice, i.e., instead of being convicted of felonious assault, Henry was convicted of the inferior offense of aggravated assault. Accordingly, any such error does not constitute grounds for overturning his conviction. *See, e.g., State v. Pairan,* 9th Dist. Summit No. 16715, 1995 Ohio App. LEXIS 1145, *11-12 (Mar. 22, 1995) ("Just as a defendant indicted on voluntary manslaughter and not on murder or aggravated murder is foreclosed from arguing as a defense to the voluntary manslaughter charge that one of the mitigating circumstances was not present[,] a defendant convicted of voluntary manslaughter is foreclosed from arguing on appeal that a mitigating circumstance was not proven. * * * [A]n appellate court's consideration should be limited to whether sufficient evidence was presented on the elements of that crime. It will be presumed (to the benefit of the defendant) that sufficient evidence was presented on mitigating circumstances."), citing *Rhodes* at 618 (where defendant is charged with only voluntary manslaughter rather than murder, "it is not a defense to voluntary manslaughter that neither party is able to demonstrate the existence of a mitigating circumstance"); *Newell*, 1993 Ohio App. LEXIS 2371, at *12 (trial court did not err in denying defendant's motion for acquittal and instructing jury on both felonious assault and aggravated assault because if any error existed in trial court's decision to give instructions on both offenses, defendant "benefited from such instructions, without which he could have been found guilty of the offense of higher degree" and any such error,

therefore, "would not have prejudiced" defendant). Accordingly, Henry's first and second assignments of error are overruled.

**Serious Physical Harm**

{¶39} In his third assignment of error, Henry contends that his aggravated assault conviction should be overturned because there is no evidence that Gatto suffered "serious physical harm."[3] R.C. 2901.01(A)(5) defines "[s]erious physical harm to persons" as any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶40} "Physical harm to persons" means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). However, "'[t]he degree of harm that rises to level of "serious" physical harm is not an exact science'"

---

[3]Although he challenges the trial court's finding that Gatto sustained "serious physical harm," Henry does not dispute that sufficient evidence was presented to support the trial court's finding that he acted "knowingly" or that the trial court's finding as to that element was supported by the manifest weight of the evidence. *See* R.C. 2903.12(A)(1) (requiring proof beyond a reasonable doubt that defendant "*knowingly* * * * [c]aused serious physical harm") (Emphasis added.).

given that the definition uses terms such as "substantial," "temporary," "acute" and "prolonged." *State v. Miller*, 8th Dist. Cuyahoga No. 98574, 2013-Ohio-1651, ¶ 18, quoting *State v. Irwin*, 7th Dist. Mahoning No. 06MA20, 2007-Ohio-4996, ¶ 37. The extent or degree of a victim's injuries is "normally a matter of the weight rather than the sufficiency of the evidence." *Irwin* at ¶ 37, citing *State v. Salemi*, 8th Dist. Cuyahoga No. 81091, 2002-Ohio-7064, ¶ 34.

**{¶41}** In considering whether the record supports the trial court's finding that Gatto sustained "serious physical harm," we are mindful of the fact that this court has "historically applie[d] a liberal interpretation of 'serious physical harm to persons.'" *State v. Davis*, 8th Dist. Cuyahoga No. 81170, 2002-Ohio-7068, ¶ 20. This court has held that, in general, a trial court does not err in finding serious physical harm where the evidence demonstrates that the victim sustained injuries necessitating medical treatment. *Id.; see also Miller* at ¶ 18 ("'when a victim's injuries are serious enough to cause the victim to seek medical treatment, it may be reasonably inferred that the force exerted on the victim caused serious physical harm'"), quoting *State v. Melendez*, 8th Dist. Cuyahoga No. 97175, 2012-Ohio-2385, ¶ 14; *State v. Littlejohn*, 8th Dist. Cuyahoga No. 95380, 2011-Ohio-2035, ¶ 21 (citing cases). However, this court has also stated that the fact that a victim seeks medical treatment does not alone "substantiate[] an inference that the victim suffered serious physical harm" and that although "[t]he inference derived from a victim seeking medical treatment is a proper factor to consider," it is "not a dispositive one." *State v. Clopton*, 8th Dist. Cuyahoga No. 95297, 2011-Ohio-2392, ¶ 14-16. For

an injury to constitute "serious physical harm," it must fall within at least one of the five categories enumerated in R.C. 2901.01(A)(5)(a)-(e). *See, e.g., State v. Addison*, 8th Dist. Cuyahoga No. 96514, 2012-Ohio-260, ¶ 29; *see also Clopton* at ¶ 15 (observing that "[t]his district has not affirmed a conviction based on a fact pattern where the victim seeking medical treatment is the only evidence establishing the serious physical harm. Quite the opposite."), citing *State v. Ivey*, 98 Ohio App.3d 249, 257, 648 N.E.2d 519 (8th Dist.1994); *State v. Enovitch*, 8th Dist. Cuyahoga No. 72827, 1998 Ohio App. LEXIS 3833, *5 (Aug. 20, 1998) (mere fact that victim sought treatment at the hospital was not enough to establish serious physical harm).

{¶42} We are also mindful that "[t]his court has consistently held that the need for stitches constitutes serious physical harm for purposes of a felonious assault conviction." *State v. Studgions*, 8th Dist. Cuyahoga No. 94153, 2010-Ohio-5480, ¶ 10; *see also State v. Williams*, 8th Dist. Cuyahoga No. 98210, 2013-Ohio-573, ¶ 19 (observing that "[t]his court has repeatedly held that the element of serious physical harm is satisfied when the evidence shows that the victim sustained injuries requiring medical treatment, including stitches"). However, in most cases, it appears that it was not simply the fact that the victim received stitches that led the court to conclude that the victim sustained "serious physical harm" within the meaning of R.C. 2901.01(A)(5), but rather, the fact that, as is often the case with an injury requiring stitches, the injury and stitches led to a permanent scar or disfigurement. *See, e.g., Studgions* at ¶ 10; *Williams* at ¶ 10; *State v. Paythress*, 8th Dist. Cuyahoga No. 91554, 2009-Ohio-2717, ¶ 6-7 (finding serious physical harm

when the medical records documented that victim sustained a three-to-four-inch cut on his face that required 60 stitches to close and victim was able to point out his injury to the jury, "suggesting that he suffered some permanent disfigurement as a result of the attack"); *see also State v. Townsend*, 9th Dist. Summit No. 24311, 2009-Ohio-3190, ¶ 10-12 (victim's testimony that defendant slapped her, punched her in the mouth, hit her in the face and spit on her, leaving her lip bleeding and hanging, requiring stitches and resulting in a permanent scar and lack of feeling in her lip was sufficient to establish "serious physical harm" under R.C. 2901.01(A)(5)); *State v. Edwards*, 83 Ohio App.3d 357, 360, 614 N.E.2d 1123 (1992) (where victim received 23 stitches for two-centimeter cut above his right eyebrow, which resulted in a permanent scar, and the reopening of a one-centimeter scar on his forehead, jury could reasonably find victim sustained some permanent disfigurement constituting "serious physical harm"). *But see State v. Craig,* 8th Dist. Cuyahoga No. 94455, 2011-Ohio-206, ¶ 45 (state presented sufficient evidence upon which jury could find defendant caused serious physical harm under R .C. 2901.01(A)(5)(c), i.e., "physical harm that involves some permanent incapacity * * * or * * * some temporary, substantial incapacity," where one victim testified that he suffered a cut to his face that required stitches to close and other testified that he needed three staples to close head wound); *State v. Churchwell*, 8th Dist. Cuyahoga No. 88171, 2007-Ohio-1600, ¶ 28 (serious physical harm shown where victim was bleeding profusely, her eyes were swollen shut and she received stitches around her eyes, without reference to scarring); *see also State v. Greene*, 9th Dist. Lorain No. 08CA009465,

2009-Ohio-2518, ¶ 9-12 (evidence was sufficient to support finding of serious physical harm under R.C. 2901.01(A)(5)(d) and (e) and felonious assault conviction was not against the manifest weight of the evidence where testimony established that officer was bleeding from his nose and mouth, needed three stitches to close a deep vertical laceration on his inner lower lip, could not eat normally and suffered pain for seven to ten days after defendant struck him in the face with his fist, causing him to fall on his arm). Further, serious physical harm has been found where a victim sustains a bloody cut and/or significant swelling to the face, even where there is no evidence stitches were required. *See, e.g., State v. Payne*, 8th Dist. Cuyahoga No. 76539, 2000 Ohio App. LEXIS 3274, *9-10 (July 20, 2000) (bloody, cut and swollen right eye was sufficient to establish serious physical harm because the injury was a temporary, serious disfigurement); *but see State v. Hill*, 9th Dist. Summit No. 26771, 2013-Ohio-5725, ¶ 24-26 (reversing conviction for felonious assault where "blunt force injuries" sustained in fist fight, i.e., scrapes or abrasions many of which were described as "superficial" or "minor," did not constitute serious physical harm); *In re Delayn K.*, 6th Dist. Huron No. H-00-029, 2000 Ohio App. LEXIS 5839, *5-6 (Dec. 15, 2000) (evidence was insufficient to establish that defendant caused "serious physical harm" to victim where victim did not need stitches, there was no medical evidence presented regarding the severity of the wound, and photographs showed wound on victim's neck "to be more of a scratch or scrape, than a 'slash'"); *Enovitch*, 1998 Ohio App. LEXIS 3833, at *5-6 (despite victim's testimony describing his injuries as a painful swollen ear and a cut over his right eye that required eleven stitches and left a

scar victim claimed "will not go away," state failed to present sufficient evidence of serious physical harm to support defendant's felonious assault conviction where hospital records described victim's injury as "minor" and other than victim's testimony, there was no evidence that the scar above his eye was permanent).

{¶43} In this case, there was no evidence that Gatto sustained any mental illness, was hospitalized or sustained any physical harm that carried a substantial risk of death. R.C. 2901.01(A)(5)(a)-(b). There was likewise no evidence that Gatto suffered from any degree of prolonged or intractable pain or was in any way incapacitated by his cut lip or "bent in" teeth. R.C. 2901.01(A)(5)(c), (e). There was no evidence Gatto missed any school or work or was precluded from engaging in any of his other ordinary activities as a result of his injury. Gatto did not claim to have a scar or any other type of permanent disfigurement. R.C. 2901.01(A)(5)(d). Accordingly, what we are left with is whether the injury to Gatto's upper lip "involve[d] acute pain of such duration as to result in substantial suffering" within the meaning of R.C. 2901.01(A)(5)(e) or a "temporary, serious disfigurement" under R.C. 2901.01(A)(5)(d).

{¶44} The photographs taken by Officer Schonberger at the hospital show Gatto with a bloodied, swollen upper lip that appears to be cut in two places. Gatto testified that he was in "excruciating pain" when he arrived at the hospital and the medical records reflect that Gatto told the hospital staff that his pain level was six out of ten at that time. Gatto testified that, as result of Henry's punch, his front teeth were "bent in," that he received 30 stitches and that he saw the "medical surgeon" "about five times" and his

family dentist twice for his injuries. Viewing the evidence in the light most favorable to the state, we find that Gatto's testimony, together with the photographs and medical records introduced by the state, was sufficient to establish that Henry caused him serious physical harm under R.C. 2901(A)(5)(d) or (e).

{¶45} Henry's manifest weight challenge is based on the same arguments and evidence (or lack thereof) as his sufficiency challenge — i.e., the absence of medical evidence corroborating Gatto's testimony regarding the severity of his injuries and the treatment he received, the lack of evidence of any permanent scarring and criticisms regarding inconsistencies in, and the lack of credibility of, Gatto's testimony.

{¶46} The severity of Gatto's injury is unclear based on the photographs alone. Although Gatto claimed to have needed 30 stitches in and around his lip to repair the injury, there is no reference to Gatto having received any stitches in the medical records. Rather, the notes from the attending emergency room physician regarding the course of treatment for Gatto's injury, simply state, in relevant part:

Because of the complexity of the repair I recommended plastic surgery. I spoke with Dr. Ulvi who stated after office hours he would come over to assess the laceration and repair. * * * Dr. Ulvi graciously came in and repaired the patient's laceration.

{¶47} Gatto testified that as a result of the punch he received from Henry his two front teeth were also "bent in"; however, there are no photographs of any damage to Gatto's teeth and no testimony or other evidence in the record explaining what Gatto

meant when he said that his two front teeth were "bent in" or how, if at all, that condition was remedied.

{¶48} Likewise, although Gatto claimed to have seen the "medical surgeon" "about five times" and his family dentist twice for the injuries he sustained, there are no medical records documenting any of this alleged follow-up treatment and, other than Gatto's testimony that a "plastic surgeon" removed his stitches, no evidence as to what this alleged treatment entailed or when it occurred. The record contains only Gatto's medical records from the emergency room at Marymount Hospital. None of Gatto's medical providers testified.

{¶49} Based on our review of the record in this case, we acknowledge that there are a number of credibility issues with Gatto's testimony. For example, Gatto's version of the events — i.e., that Henry, without any provocation, threw the first and only punch as soon as Gatto left his property — certainly strains credulity. It makes little sense that Henry would have had no physical contact with Gatto as he "escorted" him off his property and then, only after Gatto assured Henry that he wanted "nothing" more to do with Bret and was in the street "try[ing] to get in[to] [his] car," that Henry "out of nowhere" struck Gatto in the mouth.

{¶50} However, a defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness's testimony are not credible or were inconsistent or contradictory. *See, e.g., State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38, citing *State v. Asberry*, 10th Dist. Franklin No. 04AP-1113,

2005-Ohio-4547, ¶ 11.  The decision whether, and to what extent, to believe the testimony of a particular witness is "within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Johnson*, 8th Dist. Cuyahoga No. 99822, 2014-Ohio-494, ¶ 54.  It was, therefore, within the province of the trial court, as the trier of fact, to believe Gatto's testimony regarding the severity of his injuries and to find that he sustained serious physical harm as a result of Henry's actions.  It is not our role to substitute our judgment for that of the trial judge.

{¶51} After a careful review of the record in its entirety, weighing the strength and credibility of the evidence presented and the inferences to be reasonably drawn therefrom, we cannot say that this is one of those "exceptional cases" in which the trial court clearly lost its way and created such a manifest miscarriage of justice that Henry's conviction for aggravated assault was against the manifest weight of the evidence.  *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.  Accordingly, Henry's third assignment of error is overruled, and we affirm his conviction.

{¶52}  Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to

Rule 27 of the Rules of Appellate Procedure.


_____
EILEEN A. GALLAGHER, JUDGE

FRANK D. CELEBREZZE, JR., P.J., and
EILEEN T. GALLAGHER, J., CONCUR