[Cite as *State v. Callahan*, 2016-Ohio-2934.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No.   102900

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## REGINALD G. CALLAHAN

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-585455-A

**BEFORE:**   Boyle, J., McCormack, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:**   May 12, 2016

**ATTORNEYS FOR APPELLANT**

Carmen P. Naso
Milton A. Kramer Law Clinic
11075 East Boulevard
Cleveland, Ohio   44106

Amir Gholizadeh
Certified Legal Intern
Milton A. Kramer Law Clinic
11075 East Boulevard
Cleveland, Ohio   44106


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Edward D. Brydle
Assistant County Prosecutor
Justice Center
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, J.:

{¶1} On May 6, 2014, defendant-appellant, Reginald Callahan ("Reginald"), shot his nephew while inside the family home at Bessemer Avenue, Cleveland, Ohio, after an altercation ensued between the two men. Reginald maintained that he acted in self-defense. Following a bench trial, Reginald was convicted of felonious assault and having a weapon while under disability and sentenced to five years in prison. Reginald now appeals his felonious assault conviction on the grounds that the trial court "failed to consider the Castle Doctrine before considering the elements of self-defense" and that his conviction is against the manifest weight of the evidence. Finding no merit to the appeal, we affirm.

## I. Bench Trial

### A. *The Residence on Bessemer*

{¶2} The state presented seven witnesses at trial, including the victim, Delorents Bush, who was in his mid-twenties. According to Delorents, he was raised by his grandmother in the home on Bessemer Avenue.[1] In October 2012, Delorents's aunt, Pauletta Pope Callahan ("Pauletta"), and Pauletta's husband, Reginald, moved into the residence and took care of Delorents's grandmother. Reginald was also going through chemotherapy at that time.

---

[1] The record reflects that Delorents's mother had owned the house but quit-claimed the deed to Delorents's grandmother and Delorents's uncle, who both took care of Delorents.

**{¶3}** Delorents testified that he had no relationship with Reginald "other than him being my aunt's husband." Delorents further explained that he had gotten in a "little confrontation" with Reginald after Reginald and Pauletta moved into the residence. Reginald confronted Delorents about Delorents being disrespectful by failing to acknowledge him. Delorents testified that the altercation was "just verbal" and that his grandmother intervened to end the confrontation. Delorents admitted that he did not speak to Reginald because he did not like him. Delorents believed that Reginald was taking advantage of the family.

**{¶4}** Shortly after the confrontation, Delorents temporarily moved in with his cousin but ultimately returned to the Bessemer residence. In June 2013, Delorents moved out again, but still maintained his bedroom at the Bessemer residence, had his mail delivered there, and kept a key to the house.

**{¶5}** In November 2013, Delorents's grandmother died. Following her death, Delorents's uncle, David Bush, was the sole titled owner of the house. David testified that Delorents was supposed to move back and renovate the Bessemer house and that Reginald and Pauletta were moving to Las Vegas. Delorents had obtained a $25,000 loan to remodel the house, and David was in agreement with the planned renovation, including the presence of contractors at the house.

**{¶6}** Delorents testified that his aunt was "fine" with him bringing contractors to the house as part of the future renovations and that she had even offered her input with contractors that Delorents had brought to the house prior to May 6, 2014. As a courtesy,

Delorents would text his aunt to let her know beforehand if he was going to the house. The state presented text messages between Delorents and Pauletta corroborating Delorents's testimony. Specifically, on May 5, 2014 — the day before the shooting — Delorents sent his aunt a text, stating "Stopping by tomorrow Aunty round 11 or a little later."

### B. Discussion of Renovations with Contractors Sparks Heated Argument

{¶7} On May 6, 2014, a contractor and his secretary ("the contractors") arrived at the Bessemer residence to meet with Delorents. The contractors, who were hearing impaired, entered the house with Delorents. According to Delorents, Pauletta opened the front door and informed him "in a hush tone" that she did not want "anymore contractors" at the house after today. Delorents and the contractors then proceeded inside the house and sat at the kitchen table to discuss the plans.

{¶8} According to the contractors, after approximately five minutes into the meeting, Pauletta interrupted the meeting, arguing with Delorents. This argument prompted Reginald to come downstairs, resulting in Delorents engaging in a heated exchange with Reginald, both in the kitchen and then on the staircase. The secretary testified that Reginald, who was very angry, did not appear to be afraid of Delorents.

{¶9} According to Delorents, Reginald interrupted the meeting, confronted the contractor, and indicated that "[n]o work is starting until we leave." Delorents responded by saying, "Auntie, get your husband." Delorents testified that Pauletta did nothing and then Reginald ran upstairs. Delorents then followed Reginald upstairs,

reaching the first landing of the two staircases when Reginald responded, "If you come up here, I'll shoot you." Delorents then returned downstairs and the contractors left.

### C. Delorents's Version of the Events

{¶10} After the contractor and secretary left, Reginald returned downstairs, where he and Delorents continued to argue. At some point, Reginald pulled out a gun from his back pocket and Delorents ultimately called his uncle David — the owner of the house — after learning that Reginald called the police. David's cell phone recorded a message from Delorents, which the state played for the court. At trial, Delorents admitted to saying, "Reggie just pulled something out on me. I am about to smack the fuck out of him."

{¶11} Delorents explained that he was very angry and frustrated, especially because his aunt was telling him that "You're wrong, you're wrong," yet "her husband is standing behind her with a gun at his side threatening to shoot me." Delorents further testified that Reginald kept "egging him on," threatening to change the locks and claiming that he "pays all the bills."

{¶12} Delorents further explained that Reginald came in the threshold area between the living room and kitchen; Delorents was in the living room facing the kitchen and Reginald stood in the kitchen; Pauletta was between both of them facing Delorents. While Pauletta was arguing with Delorents, Reginald raised the gun up, prompting Delorents to grab Pauletta by her shoulders and move her to the side. Delorents testified that his aunt weighs "maybe 120 pounds" and that he never threw her across the room.

According to Delorents, his aunt, who was right by a chair, went over the arm of the chair, jumped back, and then turned toward Reginald for the first time. At this point, Reginald reached around Pauletta and shot Delorents.

{¶13} Pauletta called 911 for assistance. In the 911 call played before the court, Reginald is heard in the background saying, "If you wouldn't have been * * * [inaudible] * * *, you wouldn't have been shot." Reginald also remarked on Delorents's attitude.

{¶14} According to Delorents, while he laid on the ground in pain, Reginald taunted him with "trash talk," saying such remarks as: "You a whole-ass nigga"; and "Now who a bitch?" Believing that Reginald was going to shoot him again, Delorents crawled from the living room to the edge of the curb. Delorents further testified that he had removed his sweater when he first entered the house with the contractors.

{¶15} On cross-examination, Delorents acknowledged that his aunt asked him to leave the house at least three times after the arguments ensued. Delorents testified that he did not leave because he was waiting for the police to arrive. Delorents further acknowledged that in the background of the 911 call made by Reginald, Delorents can be heard speaking to his aunt, saying "I love you, but I will fuck him up."

*D. Reginald's Statement to the Police*

{¶16} Reginald was arrested on the scene where he admitted to shooting Delorents. Reginald also agreed to provide a statement to the police after being arrested, which was recorded and presented at trial.

**{¶17}** Reginald first described his relationship to Delorents, stating that Delorents "doesn't care about me." He explained that the incident started with Delorents "mouthing off." He stated that he had no intention of "going as far" as he did but explained that Delorents "really wanted to whip my ass."

**{¶18}** Reginald detailed the incident, stating that he went back up and downstairs approximately five times before shooting Delorents. He stated that prior to using the gun, he grabbed a knife but then put it down. Reginald admitted buying the gun a couple weeks earlier from someone on the street. He further explained that, although he brought the gun downstairs, he never intended to use it; he simply wanted to scare Delorents. Reginald stated that during his final trip downstairs, he placed the gun in the kitchen drawer but grabbed it when Delorents "tossed" Pauletta. Reginald then described a situation where both "fear overcame him" and Delorents "pressed up against the pistol." According to Reginald, Delorents "walked into the gun" and Reginald reacted, firing the weapon. Reginald expressed remorse but claimed that he was afraid for his life and his wife's life. He further acknowledged regret in having the "damn gun in the first place."

*E. Pauletta's Version of the Events*

**{¶19}** Reginald presented Pauletta's testimony in support of his claim of self-defense. Although Pauletta's account of the confrontation between Delorents and Reginald differed in certain aspects, she also corroborated certain key facts, such that

Delorents had authority to enter the home on May 6 and that Reginald retrieved a gun at some point during the verbal altercation.

{¶20} But unlike Delorents's testimony — casting Reginald as erratic and the primary agitator, Pauletta painted a drastically different picture. According to Pauletta, the first argument erupted when she told Delorents that any renovations to the house had to wait until after they moved out, including any work on the roof. Pauletta based this decision on the fact that Reginald gestured "no" to any work starting at the home. Delorents became very irate, stating that "I'm tired of this motherfucker always getting in the way, always blocking something."

{¶21} At this point, Reginald returned down the stairs to "maybe like the third step." Delorents yelled at Reginald to return upstairs and then "ran up" after him. According to Pauletta, she has never seen Delorents so angry. Pauletta followed Delorents up the stairs, pulling on him to come back down. At this point, Reginald was standing in the doorway of his bedroom. Delorents returned downstairs with Pauletta, where Delorents called David, saying "that motherfucker pulled a gun, I am going to fuck him up."

{¶22} When Delorents called David, Reginald simultaneously called 911 while sitting on the stairs.

{¶23} Pauletta testified that Delorents was very upset and crying. Pauletta further explained that she told Delorents to leave many times and questioned why he was treating his family this way. Delorents responded that "he hates that motherfucker." Pauletta

testified that she told Delorents that he was wrong and pushed him toward the living room and front door from the kitchen area. Reginald returned to the kitchen and ultimately grabbed a knife while Pauletta and Delorents argued. According to Pauletta, this did not "dissuade" Delorents — it only enraged him further. Pauletta testified that Delorents then took off his sweater and headed toward Reginald. Pauletta further explained that she was between Delorents and Reginald so Delorents threw her to the ground, rushing toward Reginald. At this point, Reginald shot Delorents at close range in the upper left abdomen.

## II. Presumption of Self-Defense Under Castle Doctrine

{¶24} In his first assignment of error, Reginald argues that the "trial court erred in failing to consider the Castle Doctrine before considering the elements of self-defense."

{¶25} In Ohio, self-defense is an affirmative defense that a defendant must prove by a preponderance of the evidence. R.C. 2901.05(A); *State v. Willford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990). To succeed on a claim of self-defense, a defendant must establish the following three elements: (1) no fault in creating the situation giving rise to the affray; (2) a bona fide belief that he or she was in imminent danger of death or great bodily harm and that the only means of escape from such danger was in the use of force; and (3) no violation of any duty to retreat or avoid the danger. *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002).

{¶26} R.C. 2901.09(B), also known as the "Castle Doctrine," creates an exception to the general duty to retreat (the third element), and it states in pertinent part:

a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence.

**{¶27}** R.C. 2901.05(B)(1) further explains that, subject to two exceptions contained in R.C. 2901.05(B)(2), a defendant is entitled to a presumption of self-defense "if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence * * *."   Under R.C. 2901.05(B)(2)(a), however, this presumption "does not apply if the person against whom the defensive force is used has a right to be in, or is a lawful resident of, the residence * * *."   Further, "[t]he presumption set forth in * * * [R.C. 2901.05(B)(1)] is a rebuttable presumption and may be rebutted by a preponderance of the evidence."   R.C. 2901.05(C).

**{¶28}** Reginald argues that he was entitled to a presumption that he acted in self-defense because the shooting occurred in his residence after Delorents had been instructed to leave.   Relying on the trial court's statements in announcing the verdict, Reginald contends that the trial court failed to even consider the Castle Doctrine and that the failure to properly apply the Castle Doctrine constitutes reversible error.   Reginald, however, misconstrues the trial court's statement and the circumstances entitling a defendant to the presumption of self-defense.

**{¶29}** The presumption of self-defense contained in R.C. 2901.05(B)(1) does not apply because Delorents did not "unlawfully and without privilege" enter Reginald and Pauletta's residence.   By all the witnesses' accounts, including Pauletta's, Delorents

entered the home with the express privilege to do so. Reginald's argument, however, does not focus on Delorents's entry; instead, he argues that once Pauletta told Delorents to leave, he became a trespasser and thus was unlawfully in the house. He likens the situation to that in which an invitee becomes a trespasser for purposes of aggravated burglary. *See State v. Holloway*, 38 Ohio St.3d 239, 243, 527 N.E.2d 931 (1989), citing *State v. Stefan*, 31 Ohio St. 111, 509 N.E.2d 383 (1987).

**{¶30}** But as recently recognized by the First Appellate District, "the trespassing statute speaks to a defendant entering or *remaining* without privilege." *State v. Everett*, 1st Dist. Hamilton No. C-140275, 2015-Ohio-5273, ¶ 14, citing R.C. 2911.21(A). "In contrast, R.C. 2901.05(B)(1) looks to the status of the person against whom force is used when [he or] she entered the building." *Id.* Ohio courts have consistently applied the statute this way, recognizing that the presumption contained in R.C. 2901.05(B)(1) "clearly contemplates a scenario of a home/car invasion — i.e., the person against whom the defensive force is used is in the process of unlawfully and without privilege entering (or has entered) the defendant's residence or vehicle." *State v. Nye*, 3d Dist. Seneca No. 13-13-05, 2013-Ohio-3783, ¶ 29; *see also State v. Hogg*, 10th Dist. Franklin No. 11AP-50, 2011-Ohio-6454, ¶ 36. Thus, because Delorents entered the home lawfully, the R.C. 2901.05(B)(1) presumption does not apply.

**{¶31}** But even assuming *arguendo* that the presumption of self-defense applied and that the burden had been shifted to the prosecution to prove Reginald did not act in self-defense, the record shows that the prosecution presented evidence to adequately rebut

the presumption by a preponderance of the evidence. *See* R.C. 2901.05(B)(3). Indeed, the state's evidence demonstrated that Reginald's conduct in the affray did not meet all three of the elements necessary for self-defense.

{¶32} First, turning to the first element of a claim for self-defense, the state's evidence established that Reginald, who did not have a favorable relationship with Delorents, caused the situation giving rise to the affray. According to the state's witnesses, Reginald was very upset about Delorents moving forward with any renovations while Reginald and Pauletta still lived in the house and erratically engaged in a verbal argument with Delorents. Despite the profanities being exchanged between the parties, Reginald clearly escalated the situation by retrieving and then brandishing a gun, threatening to shoot Delorents. The state further established that, after Reginald retrieved the gun, he continued to agitate Delorents. According to Delorents, as soon as one argument ended, Reginald started another. Moreover, based on Reginald's own admission, the entire situation could have been avoided if he never had brandished the gun in the first place.

{¶33} Second, the state also demonstrated that Reginald did not have reasonable grounds to believe he was in imminent danger of death or great bodily harm and that his only reasonable response was the use of deadly force. Unlike Reginald, Delorents was unarmed. Further, the state's evidence, including Reginald's own statements during the 911 calls, demonstrated that Reginald despised Delorents — not that he feared him. As

for Delorents's refusal to leave the house, he knew that the police were on their way to the home and was waiting to meet with them.

{¶34} Accordingly, we find that the trial court properly recognized that the Castle Doctrine presumption of self-defense under R.C. 2901.05(B)(1) did not apply in this case and that the record did not support a claim of self-defense. The first assignment of error is overruled.

### III. Manifest Weight of the Evidence

{¶35} In his second assignment of error, Reginald argues that his felonious assault conviction is against the manifest weight of the evidence because the evidence overwhelmingly demonstrates that he acted in self-defense and defense of his wife. We disagree.

{¶36} A challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." *Id.* In doing so, it must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved

for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

**{¶37}** Reginald argues that he proved the affirmative defense of self-defense by a preponderance of the evidence through Pauletta's testimony. He contends that Delorents's account of the incident was simply not credible and should have been disregarded. The trier of fact, however, believed Delorents's testimony, as it was free to do. "Although an appellate court must act as a 'thirteenth juror' when considering whether the manifest weight of the evidence requires reversal, it must give great deference to the factfinder's determination of the witnesses' credibility." *State v. Fisher*, 8th Dist. Cuyahoga No. 101365, 2015-Ohio-597, ¶ 43.

**{¶38}** Moreover, aside from Pauletta's obvious bias in favor of her husband, we cannot agree that her testimony established the elements of self-defense even if believed. As discussed above, the record overwhelmingly establishes that Reginald caused the situation giving rise to the affray. The verbal altercation escalated into a life-threatening situation only after Reginald retrieved and then brandished his gun. Further, based on Reginald's own statements recorded during the 911 calls as well as own statement to the police, the trier of fact reasonably concluded that Reginald did not have reasonable grounds to believe he (or his wife) was in imminent danger of death or great bodily harm that warranted the use of deadly force. And although Delorents was clearly very frustrated and angry, his conduct amounted to nothing more than verbal threats.

**{¶39}** This is not the exceptional case where the trier of fact lost its way. The second assignment of error is overruled.

**{¶40}** Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

TIM McCORMACK, P.J., and
PATRICIA ANN BLACKMON, J., CONCUR