[Cite as *State v. Echevarria*, 2018-Ohio-1193.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105815**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# NERY ECHEVARRIA

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-612167-A

**BEFORE:** E.A. Gallagher, A.J., McCormack, J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** March 29, 2018

**ATTORNEY FOR APPELLANT**

Ashley L. Jones
The Law Office of Ashley L. Jones
5755 Granger Rd., Suite 610
Independence, Ohio 44131


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
BY: James Rice
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN A. GALLAGHER, A.J.:

**{¶1}** Defendant-appellant Nery Echevarria appeals from her convictions for felonious assault. Echevarria contends that her convictions should be overturned because the trial court failed to give complete and accurate jury instructions on the issue of self-defense and because her convictions are against the manifest weight of the evidence. For the reasons that follow, we affirm.

**Factual and Procedural Background**

**{¶2}** Echevarria's convictions arose out of a December 2, 2016 altercation in which she stabbed a neighbor, Michael Butler. On December 12, 2016, a Cuyahoga County Grand Jury indicted Echevarria on one count of felonious assault in violation of R.C. 2903.11(A)(1) and one count of felonious assault in violation R.C. 2903.11(A)(2). Echevarria entered pleas of not guilty, and the case proceeded to a jury trial.

**{¶3}** The state presented testimony from three witnesses — Butler, Cleveland Patrol Officer Jonathan Rodriguez and Cleveland Police Detective Tom Manson. Echevarria testified in her defense. A summary of the relevant testimony follows.

**{¶4}** During the late afternoon of December 2, 2016, Echevarria and Butler were watching television and drinking beer at Butler's apartment. The two had known each other for approximately two years and, according to Butler, had been physically intimate in the past. After they spent some time at Butler's apartment, Echevarria invited Butler to her apartment to watch another television show. Butler drove Echevarria to her

apartment on Broadview Road in Cleveland and then went out to buy more beer before joining Echevarria at her apartment.

{¶5} Butler and Echevarria offered very different accounts as to what happened next. Butler testified that when he returned to Echevarria's apartment, he and Echevarria were in her living room socializing and drinking. He testified that Echevarria was intoxicated and that they started kissing each other. Echevarria suddenly "pulled away," became "enraged" and started making nonsensical threats, including telling Butler she was "going to get [her] cousin on [him]." Butler testified that while he was trying to figure out what was going on, Echevarria ran into the kitchen and returned with a "big meat knife." Echevarria attacked him with the knife, stabbing him on the side of the head and "clipping" his ear. Butler testified that he "football tackled her real hard," that they both "hit the floor" and that they "were in a scuffle," rolling around on the floor. Butler testified that he hit Echevarria "about three times," but she did not let go of the knife. He then got up and started kicking Echevarria, "stomping" on her head. As Butler kicked her, Echevarria cut his leg with the knife. When Echevarria began to get up, Butler turned around, grabbed his keys and coat and left the apartment. Butler testified that he drove back to his apartment a couple of blocks away, holding his hand to his head in an attempt to control the heavy bleeding. When he arrived home, approximately three or four minutes later, he knocked on a neighbor's door and asked him to call 911, then ran into the bathroom of his own apartment "to see what damage was done." Butler testified, "I had blood all over me and all over my clothes." Butler

walked out of the bathroom, sat in a chair and "almost passed out" before EMS arrived a few minutes later. EMS transported him to MetroHealth Medical Center ("Metro"), where he received stitches for the injury to his head. Butler testified that his injuries consisted of a serious cut to his forehead, another cut to his forehead, a cut on his ear and a cut or bruise on his leg.

{¶6} A toxicology screen conducted while Butler was at the hospital tested positive for cocaine and alcohol. Butler denied using crack cocaine on December 2, 2016, but acknowledged that it "could have been in my system" at the time of the altercation due to prior use.

{¶7} Butler testified that he did not know what injuries Echevarria sustained in the altercation. He testified that Echevarria continued to hold and use the knife as they were scuffling and that he used the amount of force against her that he felt was necessary to defend himself and get out of harm's way.

{¶8} Patrol Officer Jonathan Rodriguez with the Cleveland Police Department was one of the officers who responded to the 911 call made by Butler's neighbor. He testified that while he was en route to Butler's apartment, a male "flagged him down" and told the officer that his friend had been stabbed. The male led Officer Rodriguez to Echevarria's apartment while a second patrol unit proceeded to Butler's apartment. Officer Rodriguez testified that he saw blood all over the hallway leading to Echevarria's apartment. When he arrived at the apartment, Officer Rodriguez met Echevarria and asked her what had happened. He testified that Echevarria had a small cut on the left

side of her cheek, a cut on her forehead and that her face and arms were covered in blood. He did not notice any other injuries.

{¶9} Officer Rodriguez testified that Echevarria first told him that she was attacked by an unknown black male while she was opening the door to her apartment. She later told Officer Rodriguez that she was attacked by a "friend," that she was attacked by a "short black male with a burnt face" and that she was attacked by the "gringos" across the hall. Officer Rodriguez looked around the apartment and noticed that furniture had been knocked over, that the apartment appeared to have been "ransacked" and that there was blood "all over." Officer Rodriguez testified that he found a knife with blood on it in the living room which he believed had been involved in the attack. Officer Rodriguez asked Echevarria from where the knife came. He stated that she told him she didn't know. However, when Officer Rodriguez entered Echevarria's kitchen, he saw an open drawer containing knives similar to the knife he had found in the living room. He testified that Echevarria was "highly intoxicated," "disoriented" and "shocked" when he saw her but that she did not appear to be confused. After he spoke with Echevarria, she was transported by EMS to Metro for treatment of her injuries.

{¶10} Officer Rodriguez also spoke with the officers from the patrol unit that responded to the original call at Butler's apartment, viewed Butler's apartment and spoke with Butler, whom he said matched the description of a "man with a burnt face." Officer Rodriguez testified that Butler told him he was sitting on a rocking chair in Echevarria's apartment when she came out of the kitchen with a knife, yelling and screaming "for no

reason," and attacked him. According to Officer Rodriguez, Butler told him that he fell back on the rocking chair, got up and was stabbed a couple of times. Butler told Officer Rodriguez that Echevarria was on top of him and that he pushed her away with sufficient force to get her off of him, grabbed his car keys and left the apartment. Officer Rodriguez testified that Butler had "red eyes" but did not otherwise appear to be intoxicated.

{¶11} After interviewing Butler and Echevarria and viewing both apartments, Officer Rodriguez arrested Echevarria. He testified that he arrested Echevarria because she "kept switching her stories," was "heavily intoxicated," "wasn't making any sense," had lied about the knife and because Butler suffered more injuries than she did.

{¶12} Detective Tom Manson with the Cleveland Police Department was assigned to investigate the incident. After reviewing the police report, Detective Manson interviewed Butler at his home on December 3, 2016. Detective Manson testified that Butler told him he had been friends with Echevarria for two or three years and that while he and Echevarria were drinking beer and watching television at her apartment, she "got up for unknown reasons," went to the kitchen and came running back towards Butler with a butcher knife, yelling at him. He testified that Butler told him that Echevarria struck him in the left side of the head three times with the knife and that the pair began struggling on the ground for the knife. Detective Manson testified that Butler told him that he struck Echevarria "out of defensive purposes" and that he pushed her to the ground when he tried to run for the door and Echevarria got up and tried to follow him.

**{¶13}** Later that day, Detective Manson spoke with Echevarria about the incident. He testified that Echevarria told him she was at home drinking beer with Butler and asked him to leave because she had another friend coming over. According to Echevarria, Butler became "very upset" and the next thing she recalled was being on the floor with Butler punching and kicking her. Because Echevarria had not mentioned a knife in her description of the incident, Detective Manson stated that he asked her if she recalled a knife or had used a knife that evening. He testified that Echevarria indicated that she did not remember a knife "at all" and stated only that "anything she might have done was done in self-defense."

**{¶14}** Detective Manson testified that Echevarria told him she did not contact the police regarding the incident and instead reached out to a friend. Detective Manson testified that Echevarria gave him contact information for the friend but the address Echevarria gave him was "not a good address" and when he went to the address he had been given and attempted to locate the friend, he could not find the friend or anyone who knew him.

**{¶15}** He testified that Echevarria was "very bruised up" and had a laceration to the left side of her face that had been closed with stitches, small cuts to her forehead and bruising on her eyes, neck and upper chest. Detective Manson testified that if he had known the full extent of Echevarria's injuries before speaking with Butler, he would have questioned Butler "more extensive[ly]" regarding Echevarria's injuries.

{¶16} Detective Manson testified that the Crime Scene Unit took photographs of the scene and recovered from Echevarria's apartment the knife used in the altercation. He testified that the Crime Scene Unit did not collect blood samples or swab for DNA because both Echevarria and Butler were bleeding.[1]

{¶17} After the state rested, Echevarria moved for acquittal pursuant to Crim.R. 29 based on self-defense. The trial court denied the motion. Echevarria was the sole witness for the defense.

{¶18} Echevarria testified that after Butler returned to her apartment with beer, they were having a "nice time," drinking, "laughing, doing jokes" until around 9:30 or 10:00 p.m. when Echevarria told Butler it was time for him to leave. Echevarria testified that she told Butler she wanted him to leave because another friend, Jessie, was coming over and she did not want Jessie to see him there. According to Echevarria, Butler then started calling her offensive names and pushed her into a rocking chair. Echevarria testified that the chair broke and that she fell onto the floor where Butler began "slamming" her head on the ground, kicking her with his steel-toed work boots. Echevarria testified that she attempted to block the blows with her arms, causing severe bruising and permanently damaging her arm. She stated that as Butler was hitting and kicking her, she was screaming for help and reached for her cell phone. Echevarria

---

[1]In addition to the witness testimony, the state introduced a recording of the 911 call, copies of Butler's medical records related to the altercation and photographs of the knife, Butler and Echevarria's apartments and Butler and Echevarria's injuries.

testified that she could not see the numbers on the phone but was able to push a button to call Jessie, who lived four blocks away. She testified that she activated the speaker phone so Jessie could hear her screaming for help and Butler beating her. However, she did not ask Jessie to call the police.

{¶19} Echevarria testified that while Butler was kicking and hitting her, she "must have been like blacked out." She testified that she struggled to find something with which to protect herself and, with blood on her hands and her "eyes * * * full of blood," made her way into the kitchen. Butler did not follow her inside the kitchen. Echevarria testified that she grabbed the first thing she found, a knife. The knife was clean and in a kitchen drawer. Echevarria testified that as she grabbed the knife, she saw a "shadow" coming towards her. She exited the kitchen and when she reached the living room, she began swinging the knife, cutting Butler. Echevarria stated that she "didn't want to stab him or nothing," she just wanted him to leave. She testified that she screamed, "Get out my house, get out my house," and stated that "[i]f he sees me with a knife, he should have ran." She testified that she got the knife because she thought Butler was going to kill her. Echevarria maintained control of the knife throughout the altercation and did not put the knife down until Butler left.

{¶20} Echeverria testified that after she cut Butler with the knife, he "must have started going crazy." Butler ran out of her apartment into the hallway. Echevarria threw the knife somewhere in the living room and did not know where it landed. She testified that she was "too scared" to go out into the hallway and did not leave her apartment until

Jessie arrived and she opened the door for him. She testified that neither she nor Jessie called 911 but that Jessie waved down a police officer to assist her. Echeverria testified that, as a result of the altercation, she suffered a fractured nose, injured her arm, had several facial cuts and bruises, had bruising on her arms, chest and neck, received stitches for a facial cut and had a loose tooth.

{¶21} Echeverria testified that when she spoke with police shortly after the altercation, her ears were ringing, she didn't know if she was "coming or going," she was confused and scared and her "mind wasn't right." She initially testified that she did not remember if she told the police different stories about what had happened that evening but later acknowledged telling the police officer that it was "these white people that be hanging out in the parking lot in the back" who attacked her. Echevarria also offered conflicting testimony about her drinking. Echevarria originally testified that she started drinking at 3 p.m. on December 2, 2016 and that she had a couple of beers before going over to Butler's apartment. She later testified that she began drinking at 9 a.m., had a couple of beers with an eastside friend at breakfast, and then split a 12-pack and had a few tall beers with Jessie in the afternoon before heading over to Butler's apartment.

{¶22} Echevarria testified that she had been in treatment for mental health issues, including depression and a bipolar disorder, since 2010. She testified that at the time of the altercation, she had been regularly taking various prescription medications for her mental health issues, but that she did not take her medications that day. She claimed that her psychiatrist told her she could drink alcohol with her medications but that she did not

take her medications on days she knew she would be drinking alcohol due to fear of side effects, getting sick or overdosing. Echevarria testified that although she had been drinking alcohol on the day of the altercation, she told the medical staff at Metro that she was currently in a treatment program for alcohol dependence and had been "[s]ober for a month-and-a-half." Although her medical records indicated that Echevarria had exhibited "combative and agitative behavior" while at the hospital and that "[p]atient requires frequent redirection by law enforcement for aggressive behavior towards [medical] staff," Echevarria did not recall this and stated only that she was "very angry" about what had happened and "[m]aybe I was just taking it out on them."

**{¶23}** After Echevarria testified,[2] the defense rested and Echevarria renewed her Crim.R. 29 motion. Once again, the trial court denied the motion.

**{¶24}** The jury returned guilty verdicts against Echevarria on both counts of felonious assault. The parties stipulated that the two felonious assault counts were allied offenses, and the state elected to sentence Echevarria on Count One, felonious assault in violation of R.C. 2903.11(A)(1). On April 24, 2017, the trial court sentenced Echevarria to two years of community control and ordered her to pay $100 in restitution and costs.

**{¶25}** Echevarria appealed her convictions, raising the following two assignments of error for review:

> ASSIGNMENT OF ERROR NO. 1: Appellant was deprived of a fair trial and due process of law as guaranteed by the Sixth Amendment to the U.S.

---

[2]The defense also introduced copies of Echevarria's medical records related to the altercation.

Constitution and by Section 10, Article I of the Ohio Constitution due to the trial court not giving [a] full and accurate self-defense jury instruction.

ASSIGNMENT OF ERROR NO. 2: The jury erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence.

**Law and Analysis**

**Self-Defense Jury Instructions**

{¶26} In her first assignment of error, Echevarria claims that the trial court's self-defense jury instructions were inaccurate and incomplete because the trial court did not include instructions (1) that Echevarria had no duty to retreat and (2) that there was a rebuttable presumption that Echevarria "could use great bodily harm" against Butler to protect herself after she "rescinded [Butler's] status as an invited guest in her home."

**Standard of Review**

{¶27} Trial courts have broad discretion in determining whether the evidence presented at trial was sufficient to warrant a particular jury instruction. *See, e.g., State v. Williams*, 8th Dist. Cuyahoga No. 101121, 2015-Ohio-172, ¶ 35, citing *State v. Mitts*, 81 Ohio St.3d 223, 228, 690 N.E.2d 522 (1998). "'When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested instruction constituted an abuse of discretion under the facts and circumstances of the case.'" *Williams* at ¶ 35, quoting *State v. Sims*, 8th Dist. Cuyahoga No. 85608, 2005-Ohio-5846, ¶ 12, citing *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989). Whether jury instructions correctly state the law is a legal

issue that an appellate court reviews de novo. *See, e.g., State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 135*; see also State v. Brown*, 2016-Ohio-1358, 62 N.E.3d 943, ¶ 71 (11th Dist.) ("An appellate court reviews a trial court's decision to provide a jury a particular set of jury instructions for an abuse of discretion. * * * 'If, however, the jury instructions incorrectly state the law, then an appellate court will conduct a de novo review to determine whether the incorrect jury instruction probably mislead the jury in a matter materially affecting the complaining party's substantial rights.'"), quoting *State v. Barker*, 11th Dist. Portage No. 2010-P-0044, 2012-Ohio-522, ¶ 91.

{¶28} Jury instructions are "critically important to assist juries in determining the interplay between the facts of the case before it and the applicable law." *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, 24 N.E.3d 1147, ¶ 5. Although a trial court has "broad discretion to decide how to fashion jury instructions," the trial court must "'fully and completely'" give the jury all instructions that are "'relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.'" *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. In general, a trial court should give a requested jury instruction if it is a correct statement of the law, is applicable to the facts of the particular case and reasonable minds might reach the conclusion sought by the instruction. *See, e.g., State v. Hinton*, 8th Dist. Cuyahoga No. 99581, 2014-Ohio-490, ¶ 34-35*; State v. Rose*, 8th Dist. Cuyahoga No. 89457, 2008-Ohio-1262,

¶ 18; *see also State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, ¶ 134 ("'[I]t is prejudicial error in a criminal case to refuse to administer a requested charge which is pertinent to the case, states the law correctly, and is not covered by the general charge.'"), quoting *State v. Scott*, 26 Ohio St.3d 92, 101, 497 N.E.2d 55 (1986). There is, however, a limit. "No purpose is served, for instance, by requiring courts to present redundant jury instructions or instructions that are so similar to other instructions to be presented as to be confusing." *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, 24 N.E.3d 1147, ¶ 5; *see also Sowell* at ¶ 134 ("'[T]he trial court need not give the defendant's requested instructions verbatim but may use its own language to communicate the same legal principles to the jury.'"), quoting *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 108.

**{¶29}** To show reversible error, the defendant must also demonstrate that he or she was prejudiced by the trial court's refusal to give a requested jury instruction. "'A reviewing court may not reverse a conviction in a criminal case due to jury instructions unless it is clear that the jury instructions constituted prejudicial error.'" *State v. Shepherd*, 8th Dist. Cuyahoga No. 102951, 2016-Ohio-931, ¶ 25, quoting *State v. McKibbon*, 1st Dist. Hamilton No. C-010145, 2002-Ohio-2041, ¶ 27. To determine whether an erroneous jury instruction was prejudicial, a reviewing court must examine the jury instructions as a whole. *State v. Jackson*, 8th Dist. Cuyahoga No. 100125, 2014-Ohio-3583, ¶ 49; *see also State v. Jalowiec*, 91 Ohio St.3d 220, 231, 744 N.E.2d 163 (2001) ("'A single instruction to a jury may not be judged in artificial isolation but

must be viewed in the context of the overall charge.'"), quoting *State v. Price*, 60 Ohio St.2d 136, 398 N.E.2d 772 (1979), paragraph four of the syllabus. "'A jury instruction constitutes prejudicial error where it results in a manifest miscarriage of justice.'" *Jackson* at ¶ 49, quoting *State v. Hancock*, 12th Dist. Warren No. CA2007-03-042, 2008-Ohio-5419, ¶ 13; *see also* Crim.R. 52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.").

**Elements of Self-Defense, the Castle Doctrine and the Presumption of Self-Defense**

{¶30} In Ohio, self-defense is an affirmative defense that a defendant must prove by a preponderance of the evidence. R.C. 2901.05(A); *State v. Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317, 942 N.E.2d 1075, ¶ 36. To prevail on a claim of self-defense, a defendant must prove three elements: (1) the defendant was not at fault in "creating the situation giving rise to the affray"; (2) the defendant had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that the only means of escape from such danger was through the use of force and (3) the defendant did not violate any duty to retreat or avoid the danger. *State v. Callahan*, 2016-Ohio-2934, 65 N.E.3d 155, ¶ 25 (8th Dist.), citing *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002); *Goff* at ¶ 36.

{¶31} R.C. 2901.09(B) creates an exception to the general duty to retreat. *Callahan* at ¶ 26. Under R.C. 2901.09(B) — also known as the "castle doctrine" — "a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence."

**{¶32}** R.C. 2901.05(B)(1) provides that a defendant is "presumed to have acted in self defense * * * when using defensive force that is intended or likely to cause death or great bodily harm to another" if the person against whom the defendant used the defensive force "is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence * * * occupied by the [defendant] using the defensive force." The presumption is rebuttable and may be rebutted by a preponderance of the evidence. R.C. 2901.05(B)(3). Further, the presumption does not apply if the person against whom the defendant used defensive force "has a right to be in, or is a lawful resident of, the residence." R.C. 2901.05(B)(2)(a).

**{¶33}** "The difference between the Castle Doctrine and the rebuttable presumption of self-defense lies in the legal status of the victim." *State v. Lewis*, 2012-Ohio-3684, 976 N.E.2d 258, ¶ 18 (8th Dist.). If the victim was lawfully in the defendant's residence at the time the defendant used force against the victim, the defendant would not be entitled to the presumption of self-defense. *Id.* at ¶ 19; R.C. 2901.05(B)(1)-(2). However, the castle doctrine would still apply, i.e., the defendant would have no duty to retreat from the residence if the defendant were lawfully occupying the residence at the time he or she used the force. *Lewis* at ¶ 17-19; *State v. Bushner*, 9th Dist. Summit No. 26532, 2012-Ohio-5996, ¶ 16. It would then be the defendant's burden to prove the remaining elements of self-defense by a preponderance of the evidence. *Id.*

**{¶34}** At Echevarria's trial, the court gave the following jury instructions related to self-defense:

> The Defendant is asserting an affirmative defense known as self-defense to both counts in the indictment.
>
> The burden of proving an affirmative defense is upon the Defendant. She must establish such defense by a preponderance of the evidence.
> A preponderance of the evidence is the greater weight of the evidence and is evidence that you believe because it outweighs or overbalances in your mind the evidence opposed to it.
>
> In deciding whether an affirmative defense has been proved by a preponderance of the evidence, you should consider all of the evidence in the case regardless of which party produced that evidence.
>
> And if you find that the weight of the evidence is equally balanced, or if you are unable to determine which side has a preponderance of the evidence on the question of self-defense, then the Defendant has not established that defense.
>
> But, of course, if the Defendant fails to establish that she acted in self-defense, the Prosecution still must prove the elements of Count 1 and 2 to you beyond a reasonable doubt.
>
> So as to the substance of the self-defense claim, the Defendant claims to have acted in self-defense.
>
> In order to establish that she acted in self-defense, the Defendant must prove by the greater weight of the evidence that first she was not at fault in creating the situation given [sic] rise to serious physical harm to Michael K. Butler.
>
> Actually, I'm going to amend that to say that she was not at fault in creating the situation causing harm, physical harm to Michael Butler.
>
> And she had reasonable grounds to believe and an honest belief, even if mistaken, that she was in imminent danger of death or great bodily harm, and her only reasonable means of preventing it was by the use of force.

Words alone do not justify the use of force. Resort to such force is not justified by abusive language, verbal threats or other words no matter how provocative.

In deciding whether the Defendant had a reasonable ground to believe and an honest belief that she was in imminent or immediate danger of death or great bodily harm, you must put yourself in the position of the Defendant, with her characteristics, her knowledge, or lack of knowledge, and under the circumstances and conditions that surround her at the time.

You must consider the conduct of Michael K. Butler and decide whether his acts and words caused the Defendant to believe reasonably and honestly that she was about to be killed or receive great bodily harm.

If a defendant used more force than reasonably necessary, and if the force used was greatly disproportionate to the apparent danger, then the defense of self-defense is not available. And, as with every other issue in the case, these are things for you to decide based upon what you find the facts to be.

{¶35} Defense counsel timely objected on the record to the trial court's self-defense jury instructions. She asserted that, based on the castle doctrine, the jury should have been informed that Echevarria had no duty to retreat. She further argued that Echevarria was entitled to a presumption that she acted in self-defense because she had rescinded Butler's invitation to be in her home prior to the altercation. The trial court overruled defense counsel's objections, concluding that although "there is no question that Miss Echevarria did not have a duty to retreat under the circumstances in evidence here," the jury is not "required to be instructed on every duty that a person doesn't have in a case." The trial court further stated that the presumption of

self-defense set forth in R.C. 2901.05(B)(1) did not apply because it was undisputed that Butler had entered the residence at Echevarria's invitation.

{¶36} *State v. Williford*, 49 Ohio St.3d 247, 551 N.E.2d 1279 (1989), upon which Echevarria relies, is distinguishable. In that case, there was conflicting testimony as to whether the defendant lured the victim onto his porch and killed him or whether the defendant killed the victim in self-defense or in defense of his wife. *Id.* at 250. The trial court in that case had instructed the jury on the three elements of self-defense, including the requirement that the defendant prove that he did not violate any duty to retreat or avoid the danger. *Id.* at 249. The trial court did not, however, give a further instruction that the defendant was under no duty to retreat from his home. *Id.* Because there had been testimony that the confrontation between the defendant and the victim occurred in the defendant's house and on his porch, the Ohio Supreme Court found the trial court had committed prejudicial error in failing to give a "no duty to retreat" instruction. *Id.* at 250-251. The court held that the trial court's failure to give a proper "no duty to retreat" instruction[3] combined with its failure to instruct the jury that the defendant had a privilege to defend members of his family, warranted a new trial. *Id.* at 252-253. This case is different.

_____

[3]Both the Ohio Supreme Court in *Williston* and Echevarria in her brief refer to this "no duty to retreat" rule as the "*Peacock* rule," based on *State v. Peacock*, 40 Ohio St. 333, 334 (1883). In that case, the court articulated the "castle doctrine" as follows: "Where one is assaulted in his home, or the home itself is attacked, he may use such means as are necessary to repel the assailant from the house, or to prevent his forcible entry, or material injury to his home, even to the taking of life." *Id.* at 334.

**{¶37}** In this case, the trial court did not instruct the jury regarding the castle doctrine because it never instructed the jury in the first instance that Echevarria had a duty to retreat or was obligated to prove that she did not violate a duty to retreat in order to prove that she acted in self-defense. Having determined that the only reasonable conclusion that could be drawn from the evidence was that Echevarria was lawfully in her residence at the time of the altercation and that, therefore, she had no duty to retreat under R.C. 2901.09(B), the trial court addressed this issue by omitting any reference to the third element of self-defense — i.e., that Echevarria did not violate any duty to retreat — when instructing the jury what Echevarria needed to prove in order for the jury to find that she acted in self-defense. The trial court stated that it took this approach to the "no duty to retreat" issue in order to avoid potential juror confusion. As the trial court explained:

> [The self-defense jury instructions] will not include a mention that Miss Echevarria can only have used self-defense if the Jury finds, among other things, that she did not violate a duty to retreat.
>
> She was in her own home and had no duty to retreat.
>
> She does however, have to show * * * that she wasn't at fault, given rise to the situation, and she had a reasonable, even if mistaken, belief of imminent harm.
>
> * * * I think mentioning a duty to retreat, far from eliminating the possibility of confus[ion], introduces the possibility of confusion.
>
> * * *
>
> There's no factual dispute that this didn't occur in her house, but the duty to retreat is not being instructed on.
>
> The Jury is not being told * * * *that she has a duty to retreat.

* * *

A duty to retreat is not an issue in this. She doesn't have it, period * * *[.]
* * * 2909.01 applies. She has no duty to retreat. The Jury will not be
instructed that she does, which takes care of the matter * * * .

{¶38} The trial court's jury instructions removed the duty to retreat issue from the jury's consideration entirely, eliminating the third of the three elements Echevarria would have otherwise needed to prove by a preponderance of the evidence to support her claim that she acted in self-defense. What Echevarria argues the trial court should have done, i.e., instruct the jury on all three elements of self-defense and then instruct the jury that, under the castle doctrine, she had no duty to retreat — effectively negating the third element of self-defense — would have done nothing more.

{¶39} Examining the instructions as a whole, on the record before us, we cannot say that the trial court abused its discretion or otherwise erred in failing to instruct the jury regarding the castle doctrine and, instead, addressing the "no duty to retreat" issue as it did. "A trial court is required to provide the jury a plain, distinct, and unambiguous statement of the law applicable to the evidence presented by the parties to the trier of fact." *Lewis*, 2012-Ohio-3684, 976 N.E.2d 258, at ¶ 14. We believe the trial court did so here.

{¶40} Further, even if the trial court erred by not giving the jury a castle doctrine instruction, we cannot say, and Echevarria has not demonstrated, that any such error was prejudicial. There is nothing in the record to suggest that the jury charge "'probably misled the jury in a matter materially affecting [Echevarria's] substantial rights,'" *Dean*,

146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, at ¶ 135, quoting *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93, 652 N.E.2d 671 (1995), or otherwise resulted in a "'manifest miscarriage of justice.'" *Jackson*, 2014-Ohio-3583, at ¶ 49, quoting *Hancock*, 2008-Ohio-5419, at ¶ 13.

{¶41} Echevarria also argues that trial court erred in failing to instruct the jury that she was entitled to a presumption that she acted in self-defense under R.C. 2901.05(B) because the altercation occurred in her residence after she told Butler to leave.

{¶42} As stated above, a defendant is presumed to have acted in self-defense under R.C. 2901.05(B)(1) only if the person against whom the defendant used defensive force "is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence * * * occupied by the [defendant] using the defensive force." Echevarria argues that after she told Butler to leave and he failed to do so, he was no longer lawfully in her apartment, giving rise to a presumption that she acted in self-defense when using force against him.

{¶43} This court recently considered and rejected a very similar argument in *Callahan*, 2016-Ohio-2934, 65 N.E.3d 155. As the court explained:

> By all the witnesses' accounts * * * [the victim] entered the home with the express privilege to do so. " * * * R.C. 2901.05(B)(1) looks to the status of the person against whom force is used when [he or] she entered the building." [*State v. Everett*, 1st Dist. Hamilton No. C-140275, 2015-Ohio-5273, ¶ 14.] Ohio courts have consistently applied the statute this way, recognizing that the presumption contained in R.C. 2901.05(B)(1) "clearly contemplates a scenario of a home/car invasion — i.e., the person against whom the defensive force is used is in the process of unlawfully and without privilege entering (or has entered) the defendant's residence or vehicle." *State v. Nye*, 3d Dist. Seneca No. 13-13-05, 2013-Ohio-3783,

997 N.E.2d 552, ¶ 29; *see also State v. Hogg*, 10th Dist. Franklin No. 11AP-50, 2011-Ohio-6454, ¶ 36. Thus, because [the victim] entered the home lawfully, the R.C. 2901.05(B)(1) presumption does not apply.

*Id.* at ¶ 29-30.

{¶44} Likewise, in this case, because Butler and Echevarria both testified that that Butler "entered" Echevarria's apartment at her invitation — not "unlawfully and without privilege" — the presumption of self-defense under R.C. 2901.05(B)(1) does not apply. Accordingly, the trial court did not abuse its discretion in refusing to instruct the jury regarding that presumption. Echevarria's first assignment of error is overruled.

**Manifest Weight of the Evidence**

{¶45} In her second assignment of error, Echevarria challenges her convictions as being against the manifest weight of the evidence. A manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "thirteenth juror" and may disagree "with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences,

consider the witnesses' credibility and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). In conducting such a review, this court remains mindful that the credibility of witnesses and the weight of the evidence are matters primarily for the trier of fact to assess. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶46} "The use of the word 'manifest' means that the trier of fact's decision must be plainly or obviously contrary to all of the evidence. This is a difficult burden for an appellant to overcome because the resolution of factual issues resides with the trier of fact." *State v. Battiste,* 8th Dist. Cuyahoga No. 102299, 2015-Ohio-3586, ¶ 19, citing *DeHass* at paragraph one of the syllabus. Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶47} Echevarria was convicted of one count of felonious assault in violation of R.C. 2903.11(A)(1) and one count of felonious assault in violation R.C. 2903.11(A)(2). Echevarria does not dispute that ample competent, credible evidence was presented at trial establishing the elements of these offenses. Rather, she argues that her convictions are against the manifest weight of the evidence due to the "overwhelming amount of testimony supporting [her] claim that she acted in self-defense." Echevarria claims that (1) the "shocking disparity" in the injuries she and Butler sustained in the altercation, (2)

the nature of Butler's conduct during the altercation and (3) "misinformation" and "inaccuracies" in the police investigation of the incident demonstrate that she was acting in self-defense when she stabbed Butler.

**{¶48}** We find no merit to Echevarria's assertion that the jury's rejection of her claim that she acted in self-defense was against the manifest weight of the evidence. This case came down to the credibility of Butler and Echevarria and the two very different versions of the events each provided.

**{¶49}** Under Butler's account, Echevarria was the aggressor who "creat[ed] the situation giving rise to the affray," *Callahan*, 2016-Ohio-2934, 65 N.E.3d 155, at ¶ 25, when she inexplicably ran into the kitchen, grabbed a butcher's knife and started swinging it at Butler. Although Butler admitted "stomping" on Echevarria's head, he testified that he did so only because Echevarria would not put the knife down and continued trying to stab him with it.

**{¶50}** Under Echevarria's version of events, Butler was the aggressor who began name calling and then pushed, hit and kicked her when she asked him to leave. Although Echevarria claims her injuries were more severe, the state presented evidence showing that she stabbed Butler at least three times resulting in significant blood loss, a need for stitches and permanent scarring. Although Detective Manson testified that he would have questioned Butler more extensively regarding Echevarria's injuries, had he interviewed Echevarria first and learned that she had sustained more than a small cut to her face, he indicated that it did not change his view of who was the aggressor in the case,

i.e., "[i]t still didn't take away from the fact of what happened with the knife to Mr. Butler's head."  He further testified that, based on his prior experience as a police officer dealing with assault cases, he has learned that "people bruise at different rates.  What shows on me today at the initial incident may not be there tomorrow, or it might be there tenfold the next day."  Accordingly, he was not concerned by the fact that bruising he observed when he interviewed Echevarria the day following the incident was not observed by Patrol Officer Rodriguez when he interviewed Echevarria immediately following the incident.

{¶51}  The jury was presented with reasons to question Butler's testimony, such as the fact that Butler only disclosed to Officer Rodriguez initially that he pushed Echevarria away with sufficient force to get her off of him, then grabbed his car keys and left the apartment — not that he also punched her and kicked her in the head — as he admitted at trial.

{¶52} But, as detailed above, the jury was also given reasons to believe Butler's testimony and to disbelieve Echevarria's testimony, including that, on the night of the altercation, Echevarria was highly intoxicated, gave conflicting stories to Officer Rodriguez regarding what happened that evening and was combative and aggressive with the medical providers who were trying to assist her.  Echevarria also gave conflicting testimony at trial regarding when she began drinking and how much she had to drink before meeting up with Butler that evening.  Further, the physical evidence contradicts certain aspects of Echevarria's testimony.  Although Echevarria claimed that she

retrieved a knife from the kitchen while her face and hands were covered with blood after being assaulted by Butler, the crime scene photographs show no blood in the kitchen drawer from which Echevarria claimed to have gotten the knife or on the nearby refrigerator, kitchen counters or cabinets.

{¶53} On the record before us, we believe it was well within the province of the jury, as the trier of fact, to believe Butler's version of the events and to disbelieve Echevarria's account of what happened.

{¶54} A defendant is not entitled to reversal on manifest weight grounds simply because certain aspects of a witness's testimony are not credible or were inconsistent or contradictory. *See, e.g., State v. Henry*, 8th Dist. Cuyahoga No. 102634, 2016-Ohio-692, ¶ 50. The decision whether, and to what extent, to believe the testimony of a particular witness is "within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Johnson*, 8th Dist. Cuyahoga No. 99822, 2014-Ohio-494, ¶ 54. A trier of fact may believe or disbelieve all, part, or none of a witness's testimony.

{¶55} The jury was present in the courtroom with the witnesses; therefore, it was in the best position to assess the credibility of Butler, Echevarria and the other witnesses. It is not our role to substitute our judgment for that of the jury.

{¶56} After careful review of the record in its entirety, weighing the strength and credibility of the evidence presented and the inferences to be reasonably drawn therefrom, we cannot say that this is one of those "'exceptional cases'" in which the jury clearly lost its way and created such a manifest miscarriage of justice that Echevarria's felonious

assault convictions were against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Based on the evidence presented, the jury could reasonably conclude that Echevarria failed to prove, by a preponderance of the evidence, that she acted in self-defense when stabbing Butler. Echevarria's second assignment of error is overruled.

{¶57} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
EILEEN A. GALLAGHER, ADMINISTRATIVE JUDGE

TIM McCORMACK, J., and
FRANK D. CELEBREZZE, JR., J., CONCUR