[Cite as *State v. Watson*, 2026-Ohio-188.]

COURT OF APPEALS OF OHIO

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,            :

    v.                             :

GABRIELLE L. WATSON,                    :

    Defendant-Appellant.           :

No. 115036

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 22, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-695109-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Lucas Kirkland, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Rick Ferrara, Assistant Public Defender, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Gabrielle Watson ("Watson") appeals her convictions for felonious assault and assault. For the following reasons, we affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 2} On September 2, 2024, Labor Day, Watson and Daniel Gallagher ("Gallagher") got into an argument in the garage of an auto repair shop ("the shop") over a parking situation. The argument became physical after Watson walked across the floor of the shop and confronted Gallagher. Watson pushed Gallagher, punched him in the face, turned around, picked up a baseball bat and began swinging the bat at Gallagher, hitting him at least twice in the torso. One of the hits snapped the bat in two. Gallagher ultimately used his arms to keep Watson's arms behind her back as he escorted her from the shop. The incident was captured on three surveillance video cameras in the shop.

{¶ 3} On October 3, 2024, Watson was charged with felonious assault, assault and aggravated menacing. Watson raised the issue of self-defense and the case proceeded to trial before a jury. On February 12, 2025, the jury found Watson guilty of felonious assault and assault. The jury acquitted Watson of aggravated menacing. The following month, the court sentenced Watson to one year of community-control sanctions.

{¶ 4} Watson appeals her convictions, raising the following assignments of error for our review:

> I. The trial court both abused its discretion and committed plain error in instructing on self-defense instructions, causing error.
>
> II. The manifest weight of the evidence did not support Watson's convictions.

## II.    Trial Testimony and Evidence

### A. Mason Sedlak

{¶ 5} Cleveland Police Officer Mason Sedlak ("Sedlak") testified that on September 2, 2024, at approximately 7:00 p.m., he responded to a call that Gallagher "was assaulted by a female" at 4340 E. 71st St. in Cleveland, which is the location of the shop. Sedlak testified that when he arrived at the scene, Gallagher "was very shaken up." Gallagher had "[f]resh bruising to his ribcage. It's red and it's swelling." According to Sedlak, Ronnie Butcher, Jr. ("Butcher"), who owns the shop, was also on scene when the police arrived. Butcher and Gallagher are "friends and co-workers."

{¶ 6} Butcher and Gallagher showed Sedlak "[v]ideo footage" from "a surveillance system that was placed within" the shop. After viewing the videos, Sedlak "made contact with" Watson, who lived in the building next to the shop. Sedlak and his partner spoke with Watson and "listened to her side of the story." After listening, the officers "detained her, placed her in handcuffs" and assisted "her to the rear of [their] marked zone car."

{¶ 7} On cross-examination, Watson's attorney asked Sedlak how he and his partner came "to the conclusion to take . . . Watson into custody." Sedlak answered as follows: "Due to Gallagher's injuries and her being in the [s]hop when she struck him with the bat."

## B. Ronnie Butcher, Jr.

**{¶ 8}** Butcher testified that he owns the shop, which is a "tow company/repair shop." According to Butcher, Gallagher works for him part-time at the shop, and he is "a friend." Butcher further testified that Gallagher is "allowed" in the shop, even when it is closed. The general public, on the other hand, is not allowed in the shop "after-hours."

**{¶ 9}** According to Butcher, Watson lives "upstairs" in the rear unit of the building next to the shop. Butcher has had "several" interactions with Watson, concerning Watson regularly "calling, complaining" and "her car parking too close to" the shop. Butcher testified that he "parked a car one day too close to her car and she's flipping out, screaming, cussing, yelling at people, at me, at — my auto body guy was there one day making a little bit of noise outside. She cussed him out. Screaming, cussing."

**{¶ 10}** According to Butcher, Watson was not allowed in the shop, and he has communicated this to her. Butcher was not at the shop, which was closed for Labor Day, when he got a text message from Watson and a phone call from Gallagher. He then went to the shop, they told him what happened and he watched the three surveillance videos. According to Butcher, Gallagher "had not really seen or dealt with [Watson] prior to that day," although Watson "had a thing for" Gallagher "for weeks" concerning "parking spots."

> She's texted that she took up two parking spots on purpose, saying she done it on purpose. And calling him out for — supposedly she said her mirror got hit on her car. Someone hit her mirror on her car. So ever

since that day she said he hit her mirror, she's been blocking two parking spots. And yeah, calling him names and everything and he's never had a conversation with her.

{¶ 11} The prosecutor played the shop's surveillance videos, which Butcher authenticated, for the jury. The videos show the incident from three different cameras. Butcher identified Watson on the videos as she walked into the garage of the shop. Watson exchanged words with Gallagher and walked out of the shop. According to Butcher, the videos show that, approximately two minutes later, Watson walked back into the shop and approached Gallagher again.

{¶ 12} Butcher also identified photographs he took of the baseball bat that Watson had used to strike Gallagher during the incident. The bat was broken into two pieces and, according to Butcher, the break was "Sharp. Wood. Splinters." Butcher described the bat as a "Louisville Slugger. Weight of it is probably seven, eight pounds. The length is normal size baseball bat."

{¶ 13} Butcher confirmed that he told Watson "several" or "three" times that she was not allowed to enter the shop, with the most recent time being a "few weeks" before the incident on Labor Day.

{¶ 14} Under cross-examination, Butcher was asked if Watson came into the shop and started "assaulting people." Butcher answered as follows: "No. She came in aggressive. You could see that from the video . . . . She came in cussing and waiving [sic] her arm."

{¶ 15} Under redirect-examination, Butcher was asked to describe Gallagher's demeanor after the incident. "He was — he was like in shock. He didn't

understand what was going on, so he was like what do I do, Ron, what do I do.  I'm like I would call the police . . . .  He was all over the place.  Just like, man, she just come in here and hit me over a parking spot.  He just was rattled up."

**C. Daniel Gallagher**

{¶ 16} Gallagher testified that he works full time for General Motors in Parma and part-time for Butcher at the shop.  Gallagher lives in a building on the same property as the shop and, at the time of trial, he had lived there for five years.  According to Gallagher, he is 6′1″ tall and weighs 270-280 pounds.

{¶ 17} Gallagher testified that on September 2, 2024, he approached Watson near the door to her apartment and asked her to move her car because it "was double-parked in the last two parking spots in the residential parking."  At first, Watson did not respond.  Gallagher asked again.  Watson said yes and moved her car.  The two exchanged words and, according to Gallagher, Watson said, "I am that bitch and if you want to find out, I got a red tip for your ass."  Gallagher testified that he "assumed and believed that she was talking about a caliber of bullet and a weapon."  Gallagher said he "felt threatened for sure."

{¶ 18} Gallagher went into the shop and talked to the mechanic about the incident, telling him that "the lady next door just was threatening me."  Gallagher testified that, three to four minutes later, Watson walked into and across the garage of the shop toward Gallagher.  According to Gallagher, Watson told him to "shut up" and said that nobody likes him.  Gallagher testified that he put his hands up in the air because he did not understand what Watson was doing there.  "I didn't

understand what — she took it upon herself to come there to begin with, other than the fact that this had just occurred after — you are talking about maybe three or four minutes after I had just had the situation with her outside. So this isn't — I don't know what she was doing at all."

{¶ 19} Gallagher testified that Watson left the shop and came back a few minutes later. According to Gallagher, Watson "came back to tell me whatever she had left to say in regards to, you know, you're a dumb-ass or whatever it was." Gallagher's testimony continued:

> Again, I was not — I was trying to — she had just left and come back. So I was really kind of on my guard like because I didn't know why she went outside and come back in as far as, you know, what she had just done. So now I am really watching her and trying to — I am not really caring about anything that she's talking about.

{¶ 20} Gallagher testified that he told Watson she needed to leave. Specifically, Gallagher testified that he said the following: "That was when I told her you need to leave now. Again, I told her this is not your apartment, this not the streets; this is a business, you need to leave now." According to Gallagher, that is when Watson "became out of control." Watson pushed Gallagher, at least once, and began swinging her fist at him. Watson punched Gallagher in the face. Gallagher testified that he was "wary" of Watson, and he "was trying to just do [his] best to get her out of the garage."

{¶ 21} The State again played the videos for the jury. Asked what was running through his head when Watson turned around and picked up a baseball bat, Gallagher testified as follows:

I was aware that she had picked up the bat. And being in the garage like that, I know where things sort of are, I know the layout of it. I mean, the fact that she ended up grabbing a bat, that was random. She just randomly picked up the bat. That was what I was thinking. It could have been anything. There's a number of things over there; tools, metal, anything. She happened to grab the bat.

{¶ 22} Asked to explain why he is seen in the videos with his arms out in the air, Gallagher testified that he was "trying to . . . be [as] nonphysical as possible with her." According to Gallagher, Watson is seen in the videos swinging the bat and hitting Gallagher with the bat, twice. On the second hit, the bat breaks in half. Gallagher testified that he grabbed Watson's arms and pulled them behind her back in an attempt to "subdue" her. According to Gallagher, Watson is still holding the handle half of the broken bat with sharp jagged edges, "which has turned into a knife of sorts." Gallagher testified that he was trying to get the bat away from Watson.

{¶ 23} Ultimately, Gallagher and another shop employee walked Watson out of the shop. According to Gallagher, Watson took a photograph of him with her phone and told him "she was going to have people come and get" him. Gallagher called Butcher and told him, "[T]he lady upstairs just came into the [s]hop and assaulted me. She grabbed a bat." Gallagher then called 911. Gallagher further testified that he did not feel he needed an ambulance although he had bruising on his "side" from "the nub of the bat." Gallagher testified that he was "sore" but he did not seek medical attention.

{¶ 24} On cross-examination, Gallagher testified that a detective contacted him the day after this incident took place, but he never met with a detective.

Gallagher also testified that he told the 911 operator that he "was threatened with a weapon," and he gave a statement about what happened to the two police officers who arrived at the scene. According to Gallagher, in addition to the bruise on his side, he injured his hand when he tried to block the bat that Watson was swinging at him and the bat broke.

### D. Johnny Harris

{¶ 25} Cleveland Police Detective Johnny Harris ("Harris") testified that he was assigned this case on September 3, 2024. Harris read the report, watched the videos and spoke with Gallagher, who told Harris that he was "struck with a bat three times." Harris testified that he did not need to go to the scene of the incident in this case because he had all the information he needed to take the case to the prosecutor. Specifically, Harris testified that the videos showed a woman "hit [Gallagher] in the face . . . swinging a bat, hitting him three times on the side. And that was an assault right there."

### E. Gabrielle Watson

{¶ 26} According to Watson, the apartment building in which she lives is located on the same property as the shop. Watson knows who Gallagher and Butcher are from the shop. Watson testified that parking for her apartment building and the shop is a "free-for-all." Watson has lived in this apartment since December 2023, and she estimated that she has been in the shop "over 20 times" to talk to people who worked there and to have her car repaired. Watson testified that she is 5′10 ½″ tall and weighs "[a]bout 160" pounds.

{¶ 27} According to Watson, she has never been banned from entering the shop, and she was never "made aware" of a sign telling people that they could not enter the shop. Watson testified that customers "constantly" go into and come out of the shop. According to Watson, she and Gallagher have had more than ten incidents "over the car parking situation" and there was "actual damage" to her car as a result these incidents. Specifically, Watson testified as follows:

> It was constant dings on my car. And every time the dings were on my car was when [Gallagher's] car was next to my car was when I noticed it. Every single time. Anytime one of the other neighbors, for instance, were parked next to my car, they were parked far enough to where I didn't — obviously, it couldn't have been them. They were parked far enough. Like if I was to open my door far enough and I know it wasn't going to hit theirs, so I know theirs wasn't going to hit mine just as well.

{¶ 28} According to Watson, she reached out to Butcher, a mechanic who worked for Butcher and the property manager when Gallagher would cause damage to her car. Asked why she did not reach out to Gallagher about these situations, Watson stated that she did not know Gallagher. "I never seen him. I just would see his car. Like I seen him, you know, walking back and forth and I seen him getting into the car eventually, so I knew it was his car, but I never knew the man personally. I didn't know who he was."

{¶ 29} Watson testified that on September 2, 2024, Gallagher approached her and asked her to move her car. According to Watson, she told Gallagher, "[Y]eah, I can move my car if you know how to park your car correctly." Watson then moved her car. Watson admitted to taking up two parking spaces, stating that Gallagher's car has been parked over the line and he has "nicked" her car a few times.

{¶ 30} According to Watson, she went into the shop to talk to the mechanic, which is something she "literally [has] done multiple times." Watson testified that the garage door to the shop was open, so she walked into the shop, which is something that she has "always done if the door was open . . . ." Watson testified that she went into the shop to talk to the mechanic, not to talk to Gallagher, but Gallagher started "yelling" at her "or saying something." According to Watson, she left the shop but came back "because it was an unsuccessful conversation in the first place when I went down there the first time."

{¶ 31} Watson testified that she did not expect Gallagher to be in the shop because she had "never ever seen that man in there" before. Watson testified as follows about what occurred at the shop the second time she entered the garage:

> As I go in the second time, I see [Gallagher] still there. And I told — I said I didn't come here to talk to you; I came in here to talk with [the mechanic].

> Once that happened, he started to say stuff again. I really don't — I really don't recall what he was saying. Like I said, I was — I am not going to say ignoring him, but I really was trying to ignore him because he wasn't my focus. . . .

> Once that occurred, [Gallagher] started to just get in my face and he started to chest bump. Like I don't know how to put it. He's a big man, obviously. He was like belly bumping me and like kind of knocking me and like pushing me backwards. And I start to lose my balance. I — I didn't even know what to do. I was frankly scared.

{¶ 32} Watson testified that Gallagher "was the first person to have . . . physical contact" with her. Watson's testimony continued:

> He was pushing me with his stomach, like chest bumping me really hard . . . .

And at that point I'm scared. I don't know what to do. And I seen the bat, so I picked it up. And I tried to keep my distance from him initially and he just kept coming towards me and kept coming at me, so that's when I swung. . . .

I don't — I really don't know what he — like, again, I don't know what he was saying. I am telling him to get his hands off of me. I didn't understand why he kept trying to get closer to me and getting in my face as — for a man of his size. . . .

Everything kind of started to happen so fast. Once he started to get in my face and started to push me and I started to lose balance, I literally didn't know what to do. I just was scared and I felt like I – I really don't know. I was scared more than anything. Everything happened so fast. It happened fast. . . .

I thought he was really about to hurt me. He kept grab — like after he started to push me, he was like grabbing me. And he was like throwing me like a rag doll, like manhandling me. And I just couldn't — I barely could get away from him as it was.

{¶ 33} Asked why she reached for the bat, Watson answered:

Because he wouldn't get off of me. He just kept coming towards me, kept coming at me, yelling at me. Scaring me, frankly. . . . Because I was scared for my life from this man. He's a huge man that kept coming at me and yelling at me. And at this point I just wanted us to keep our distance, just get away from me, just stop touching me. I didn't understand why he even put his hands on me, why he was pushing me in general.

{¶ 34} Watson testified that she was not "able to run out of the garage on" her own at that point. According to Watson, the incident "ended with pretty much him putting my hands behind my back and getting me out of the garage, just telling me to get out of the garage." Watson called 911 and told the operator that she picked up a bat because a 200-to-300-pound man pushed her and she was defending herself.

{¶ 35} Watson testified that when police officers arrived, she told them she was defending herself and she had "bruises," although there are no photographs in the record reflecting any injuries on Watson. While the officers were at the scene, Watson was taken into custody. According to Watson, nobody from law enforcement followed up with her.

{¶ 36} The videos of the incident were again played for the jury, and Watson was asked why she grabbed the bat. She responded as follows:

> Because he kept pushing me and coming at me. I just start to fall over . . . . I was really scared for my life. He kept trying to reach and grab me. It kind of looked like I punched him, but I know I didn't. He was like — he grabbed my arm and I don't even know how exactly it happened, but like how — it's just like how my arm went like this in the video kind of. Like he kept grabbing my arm and like I guess I would say misdirecting it. I don't know.

{¶ 37} Under cross-examination, Watson testified that she did not know the shop was closed on Labor Day because the bay door of the garage was open. She also testified that she did not see the sign at the shop indicating that it was not "a public business." Additionally, Watson denied that Butcher told her previously "not to come into the [s]hop."

{¶ 38} After playing the videos, which depict the altercation between Watson and Gallagher, the prosecutor asked Watson if it was still her testimony that Gallagher "got in [her] face first." Watson replied, "Yes. I was initially — prior to that, if you noticed prior to that, he walked up on me. But, yes, it is." Watson insisted that Gallagher hit her. When the videos showed no such thing, because Gallagher's hands are up in the air, Watson stated, "[H]is hand may not physically — his hand

did not hit me, but his arm did hit me." The prosecutor played the videos again and the following colloquy ensued:

> Q: Now, Ms. Watson, I do not see him hit you at all there. I see his hands up. And, in fact, I see you hit him. Is that what you saw?
>
> A: It looks like I did.
>
> Q: It looks like you did?
>
> A: Yes.
>
> Q: And it's your testimony today that you never hit him?
>
> A: From my recollection, no. My hand, no. From my recollection.
>
> Q: I am not asking about your recollection. I am asking what we just saw.
>
> A: No.
>
> Q: No, you never hit him. Okay.

## III. Jury Instructions

{¶ 39} After both the State of Ohio and the defense rested their cases, the court instructed the jury on self-defense, pursuant to the *Ohio Jury Instructions* ("OJI"), CR § 421.21 (Rev. Nov. 5, 2022), as follows:

> Now, State's proof. To prove that the defendant's use of deadly force was not in self-defense, the State must prove beyond a reasonable doubt at least one of the following: One, the defendant was at fault in creating the situation giving rise to the incident in the [Shop]; or two, the defendant did not have reasonable grounds to believe that she was in imminent or immediate danger of death or great bodily harm; or the State must prove that the defendant did not have an honest belief, even if mistaken, that she was in imminent or in danger of death or great bodily harm; or the defendant violated a duty to retreat to avoid the danger; or the defendant used unreasonable force.
>
> . . .

Unreasonable force.  A person is allowed to use force that is reasonably necessary under the circumstances to protect herself from an apparent danger.  For you to find the defendant guilty, the State must prove beyond a reasonable doubt that the defendant used more force than reasonably necessary and that the force used was greatly disproportionate to the apparent danger.

## IV.  Law and Analysis

### A. Jury Instructions

{¶ 40} Appellate courts review a trial court's decision to provide, or to not provide, specific jury instructions under an abuse-of-discretion standard.  *State v. Guster*, 66 Ohio St.2d 266, 271 (1981).  An abuse of discretion occurs when a court exercises its judgment "in an unwarranted way in regard to a matter over which it has discretionary authority."  *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.  However, "[w]hether jury instructions correctly state the law is a legal issue that an appellate court reviews de novo."  *State v. Echevarria*, 2018-Ohio-1193, ¶ 27 (8th Dist.).  For a jury instruction error to be reversible, the defendant must also show prejudice.  *Id*. at ¶ 29.

{¶ 41} Trial courts are required to "fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder."  *State v. Comen*, 50 Ohio St.3d 206, 210 (1990).  "In determining whether . . . sufficient evidence exists in the record to support the giving of a proposed jury instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction."  *State v. Hinton*, 2014-Ohio-490, ¶ 34 (8th Dist.). "However, a trial court does not err in failing to instruct the jury on an

affirmative defense where the evidence is insufficient to support the instruction." *Id.* "In general, a trial court should give a requested jury instruction if it is a correct statement of the law and reasonable minds might reach the conclusion sought by the instruction." *Echevarria* at ¶ 28.

### B. Self-Defense

{¶ 42} In *State v. Messenger*, 2022-Ohio-4562, ¶ 1, the Ohio Supreme Court held that "when a defendant presents a claim of self-defense in a criminal case, the state has the burden of disproving that self-defense claim beyond a reasonable doubt." *See also* R.C. 2901.05(B)(1) (stating that "the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense"). To present a claim for self-defense, a defendant must show that he or she (1) "was not at fault in creating the situation giving rise to the affray"; (2) "had a bona fide belief that [she or] he was in imminent danger of death or great bodily harm and . . . his [or her] only means of escape from such danger was in the use of such force" and (3) "did not violate any duty to retreat or avoid the danger." *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). The State, on the other hand, "need only disprove one of the elements of self-defense to sustain its burden at trial" that the defendant was not acting in self-defense. *State v. Walker*, 2021-Ohio-2037, ¶ 14 (8th Dist.).

{¶ 43} Relevant to this appeal, this court has held that "the second element of self-defense involves both objective and subjective considerations." *State v. Hughkeith*, 2023-Ohio-1217, ¶ 56 (8th Dist.). *See also State v. Thomas*, 77 Ohio

St.3d 323, 330 (1997) ("[T]he second element of self-defense is a combined subjective and objective test.").  "A defendant's belief that she was in immediate danger of death or great bodily harm must be objectively reasonable, and the defendant must have an honest belief that she sat in such danger."  *Hughkeith* at ¶ 56. "[I]f the objective standard is met, the jury must determine if, subjectively, this particular defendant had an honest belief that she was in imminent danger." *Thomas* at 326.  The State may disprove self-defense via either the objective or the subjective prong of the second element of the test.  *Id.*  Furthermore, the subjective standard — the "honest belief" — may be based on a mistaken notion.  *See State v. Hunt*, 2023-Ohio-1977, ¶ 26 (8th Dist.).

{¶ 44} Additionally, this court has held that the "amount of force used in self-defense . . . must be reasonable. . . .  Where one uses a greater degree of force than is necessary under all the circumstances, it is not justifiable on the grounds of self-defense. . . .  The issue of whether a defendant used unreasonable force in repelling a perceived danger is a question of fact for the jury."  *State v. Taslitz*, 2015-Ohio-3474, ¶ 20 (8th Dist.).  *See also* 2 OJI CR 421.21(E).

{¶ 45} In Watson's first assignment of error, she argues that the trial court erred when it instructed the jury on self-defense.  Specifically, Watson argues that the jury instruction concerning "unreasonable force" is somehow incompatible with the "subjective standard" portion of the second prong of the self-defense test.  To quote Watson's appellate brief directly (emphasis in original):

[T]he State of Ohio could meet its burden to defeat Watson's claim of self-defense simply by showing that unreasonable force was used[.]

. . .

The Court plainly erred by objectively stating the wrong words in the instructions relating to Watson's basis for defense, requiring (1) objectively that Watson "reasonably believed," rather than "honestly believed" that the force she used was necessary: "This is going to a reasonable belief." . . . and (2) that the jury "decide whether . . . Gallagher's acts and words caused the defendant to *reasonably and honestly believe* . . .", [ellipsis in original] rather than have a reasonable basis and honest belief . . . ."

. . .

This shared subject matter of the "mistake" instruction sets up the conflict with the unreasonable force instruction. Both instructions allow the jury to consider *how much of a response* was permitted. . . . Both the "mistake" instruction and the "unreasonable force" instruction were the only instructions that overlapped in purpose — negating self-defense if disproved beyond a reasonable doubt and examining the magnitude of Watson's response in self-defense, rather than her culpability for other reasons.

{¶ 46} Although somewhat unclear from her appellate brief, we understand the essence of this argument to be that "the 'unreasonable force' instruction negated the possibility that Watson could make a subjective mistake" concerning her "honest belief" that she was in imminent danger.

{¶ 47} We are mindful of the test appellate courts use when reviewing a trial court's jury instructions. "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 2015-Ohio-3954, ¶ 240. There is no question that the trial court's jury instructions in this case were correct statements of law. Upon

review of the trial testimony and evidence — particularly, the video footage of the incident, which was in color, with a clear picture and consisted of three different camera angles — we find that the jury instructions, including the use of "reasonable force," were applicable to the facts of this case. Furthermore, reasonable minds may have reached, and in fact did reach, the conclusion sought by the instruction, which, in this case, was whether Watson acted in self-defense.

{¶ 48} Watson's position that the State could "defeat Watson's claim of self-defense simply by showing that unreasonable force was used" is an accurate statement of the law in Ohio regarding self-defense. *See, e.g., State v. Rhymer*, 2021-Ohio-2908, ¶ 20 (1st Dist.) ("If a jury finds that a defendant used unreasonable force, then it cannot find the second element in favor of the defendant. Therefore, the outcome is the same as if the jury considered reasonable force as a fourth element."). As stated earlier in this opinion, the State "need only disprove one of the elements of self-defense to sustain its burden at trial" that the defendant was not acting in self-defense. *Walker*, 2021-Ohio-2037, at ¶ 14.

{¶ 49} We cannot say that the trial court abused its discretion in instructing the jury regarding self-defense in this case. Accordingly, Watson's first assignment of error is overruled.

### C. Manifest Weight of the Evidence

{¶ 50} A manifest-weight-of-the-evidence challenge attacks the credibility of the evidence presented and questions whether the State met its burden of persuasion. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.). Weight of the

evidence "addresses the evidence's effect of inducing belief," i.e., "whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 2007-Ohio-2202, ¶ 25. *See also State v. Thompkins*, 78 Ohio St.3d 380, 386-387 (1997). When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of . . . conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Furthermore, in *State v. Jordan*, 2023-Ohio-3800, ¶ 17, the Ohio Supreme Court held that "[s]itting as the 'thirteenth juror,' the court of appeals considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion."

{¶ 51} In a manifest-weight challenge, the appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Reversal on manifest weight grounds is reserved only for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*

{¶ 52} We note that the State's "burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal . . . ." *Messenger*, 2022-Ohio-4562, at ¶ 27.

{¶ 53} In her second assignment of error, Watson challenges the jury's finding that she did not act in self-defense as being against the manifest weight of the evidence presented at trial. Watson's manifest-weight argument does not concern the elements of felonious assault or simple assault. Rather, it only concerns the elements of self-defense. *See Cleveland v. Williams*, 2003-Ohio-31, ¶ 10 (8th Dist.) (A "defendant claiming self-defense does not seek to negate an element of the offense charged but rather seeks to relieve himself from culpability.").

{¶ 54} Specifically, Watson argues that her "claim of self-defense . . . was so personal to her — her size versus Gallagher's — that it could not have been determined beyond a reasonable doubt that the State met [its] burden as to any aspect of self-defense." Watson cites various parts of the trial transcript to show that she "could rightfully, subjectively feel that" she needed to act in self-defense. According to Watson, this argument equates with her convictions being against the manifest weight of the evidence. We disagree.

{¶ 55} The video footage of the incident clearly shows that Watson was the initial aggressor in this situation, it was not objectively reasonable for her to believe that she was in danger and her use of a baseball bat to hit Gallagher amounts to unreasonable force under these circumstances. "Generally, a defendant, having willingly advanced toward a volatile situation cannot rely on the affirmative defense of self-defense." *Walker*, 2021-Ohio-2037, at ¶ 19. *See also State v. Gardner*, 2022-Ohio-381, ¶ 25 (8th Dist.) ("The first prong of the self-defense test — whether the defendant was at fault in creating the situation giving rise to the affray — asks, in

essence, whether the defendant was the initial aggressor."). In *Walker*, the defendant "escalated the altercation by voluntarily advancing and using a deadly weapon in a situation in which the objective evidence does not conclusively establish that Walker was being beaten to the point that his life was endangered." *Id.* at ¶ 20.

{¶ 56} In this case, Watson aggressively entered the shop's garage for the second time in two minutes and walked across the space directly toward Gallagher. Although the videos in evidence have no sound, Watson can be seen initiating a verbal altercation with Gallagher, then initiating a physical altercation with Gallagher. Watson invaded his personal space, pushed him, shoved her body into him and punched him in the face. Watson's testimony that her arm was directed by Gallagher to look like she punched him and that Gallagher hit her first is simply unbelievable.

{¶ 57} Watson then turned around, picked up a bat and began swinging at Gallagher, connecting two or three times, which broke the bat in half. Watson held onto the now-jagged-edged bat handle and continued swinging it at Gallagher.

{¶ 58} From the video footage, the only moves that Gallagher made were, first, to initially put his arms in the air and use his body to deflect Watson's assault, and second, to ultimately pin her arms behind her back (while she is still holding the broken bat) and lead her outside of the shop.

{¶ 59} The events depicted clearly in the videos were corroborated by Gallagher's testimony and the photographs of the broken bat and Gallagher's injuries. Additionally, testimony from the police officers and the shop owner was

consistent with the video footage. Watson's testimony, on the other hand, was inconsistent in many respects with what the videos plainly showed. This court has consistently held that "[s]elf-defense claims are generally an issue of credibility." *Walker*, 2021-Ohio-2037, at ¶ 13. Additionally, a "conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent or contradictory testimony." *State v. Russaw*, 2022-Ohio-2145, ¶ 28 (8th Dist.).

{¶ 60} Upon review, we cannot say that the jury clearly lost its way in convicting Watson of felonious assault with a deadly weapon and simple assault by rejecting Watson's self-defense claim. *See State v. Zafar*, 2020-Ohio-3341, ¶ 47 (10th Dist.), quoting *State v. Clouse*, 2012-Ohio-3471, ¶ 35 (10th Dist.) ("This court and other Ohio appellate courts 'have repeatedly held that a baseball bat, wielded with the requisite intent, meets the definition of R.C. 2923.11(A) as a deadly weapon.'").

{¶ 61} Accordingly, Watson's second assignment of error is overruled.

{¶ 62} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, J., CONCURS;
EILEEN T. GALLAGHER, P.J., CONCURS IN JUDGMENT ONLY